# IN THE SUPREME COURT OF IOWA

No. 14–0256

Filed January 22, 2016

Amended April 5, 2016

**STATE OF IOWA,**

    Appellee,

vs.

**KENT ANTHONY TYLER III,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

The State seeks further review of a decision of the court of appeals reversing the defendant's second-degree murder conviction for insufficient evidence. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED.**

Angela Campbell of Dickey & Campbell Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Bruce L. Kempkes and Linda J. Hines, Assistant Attorneys General, John P. Sarcone, County Attorney, and Daniel Voogt and Stephanie Cox, Assistant County Attorneys, for appellee.

**MANSFIELD, Justice**.

This case requires us to consider whether substantial evidence supports the second-degree murder conviction of an individual who struck the first, nonlethal blow in a fatal beating. The defendant's blow knocked the victim down. Others in the group surrounding the victim then kicked and stomped him to death.

We conclude that substantial evidence supports the jury's guilty verdict on theories of both principal liability and accomplice liability. However, there is not substantial evidence to support the theory of joint criminal conduct that was also submitted to the jury. Since the jury returned a general verdict of guilty, and the possibility exists that one or more jurors found the defendant guilty only on the basis of the invalid theory of joint criminal conduct, we must reverse the defendant's conviction and remand for a new trial. In doing so, we affirm the district court's evidentiary ruling relating to prior fighting by the defendant and others who assaulted the victim.

## I. Facts and Procedural Background.

We recite the facts in the light most favorable to the State. *State v. Neiderbach*, 837 N.W.2d 180, 187 (Iowa 2013). On the night of August 24–25, 2013, a crowd of twenty to forty teenagers was gathered at an empty lot next to the Des Moines River in downtown Des Moines. They were drinking, dancing, and listening to music. About ten to fifteen cars were present. Some in the crowd were dancing on the cars.

Richard Daughenbaugh, a forty-year-old man who was under the influence of alcohol and methamphetamine, pulled up in his truck uninvited. He honked his horn repeatedly at one of the male teenagers present, insisting he move out of the way so Daughenbaugh could park. After they had exchanged words, Daughenbaugh parked his vehicle.

Daughenbaugh then got out of his vehicle and began mingling, dancing, and drinking with the crowd for about fifteen minutes.

Isiah Berry had been fishing with his girlfriend Monica Perkins nearby for most of the day. He gave up trying to fish because one of the teenagers had grabbed his fishing pole and made a sarcastic comment when Berry asked for it back. Berry and Perkins were making plans to go home. But they stayed when Perkins saw a situation that made her believe something was about to happen.

A group of the partiers had surrounded Daughenbaugh. One of the people in the group, the defendant Kent Tyler, threw a punch at Daughenbaugh's face that knocked him to the ground.[1] Daughenbaugh moved on the ground and tried to get up. He never did get up. Members of the group immediately jumped and stomped on Daughenbaugh as he was lying on the ground. While he was being stomped on, Daughenbaugh was helpless, doing nothing to defend himself.

Perkins rushed over and threw herself on top of Daughenbaugh, attempting to protect him. When one person tried to kick Perkins, Berry ran in to rescue his girlfriend. An assailant hit Berry from behind; Berry hit his assailant back. Eventually some of the partiers chased Berry, tripped him, hit him, and stomped on him as well.

---

[1]Witnesses offered differing accounts as to whether Daughenbaugh did anything to provoke Tyler's punch. Perkins and B.B. (a seventeen-year-old who was part of the gathering) testified that Daughenbaugh was just partying and not causing any trouble. Some members of the gathering testified that Daughenbaugh walked up to Tyler, or that Daughenbaugh touched or pushed up against Tyler.

Likewise, witnesses differed as to what Tyler did after punching Daughenbaugh. One witness from the group of partiers (L.S.) testified Tyler walked away. Another witness (E.R.) testified Tyler hit Daughenbaugh but did nothing else thereafter. On the other hand, Perkins testified, "I think it was the one guy [who] hit his face [who] stomped on his face."

Perkins made a frantic call to 911 and tried to describe what was happening. Two girls in the crowd grabbed Perkins's phone from her and threw it away. Still, the call went through long enough that police soon arrived.

Berry suffered bruises and abrasions. Daughenbaugh died from his injuries. Although Daughenbaugh also had facial abrasions and bruising, the autopsy revealed that the cause of his death was a severely torn mesentery, leading to internal bleeding. The mesentery is the membrane connecting several body organs to the posterior abdominal wall. Daughenbaugh's mesentery was torn due to his being kicked and stomped on when he was unable to defend himself. As the medical examiner later explained, a torn mesentery is typically seen in child abuse cases but is unusual in the case of an adult like Daughenbaugh who can normally protect himself. The medical examiner added, "[T]hese injuries from a forensic standpoint indicate that the victim, the decedent, was probably unable to defend himself at the time the blows were rendered to the abdomen."

The next day, Tyler was Mirandized and interviewed. He admitted he had attended the party by the river that night. However, he claimed he had been sitting in a parked car playing music at the time and had no involvement in the beating whatsoever.

Tyler and three others—James Shorter, Yarvon Russell, and Leprese Williams—were subsequently charged with first-degree murder. *See* Iowa Code § 707.2 (2013). The cases were severed for trial. Tyler's case went to trial from December 9 through December 17. In addition to first-degree murder, the jury was instructed on the lesser included offenses of second-degree murder, attempted murder, voluntary manslaughter, willful injury causing serious injury, willful injury causing

bodily injury, involuntary manslaughter by public offense, involuntary manslaughter by act, assault with intent to inflict serious injury, assault causing serious injury, assault causing bodily injury, and assault.

At trial, the State's witnesses included B.B.[2] She testified that she saw a group form around Daughenbaugh that included Tyler, Shorter, Russell, and Williams. Over Tyler's objection, she also testified that she wanted to leave at that point because she had seen them fighting before, she knew what was going to happen, and she didn't want to be a part of it. She testified that although she did not see who struck the first blow, she did see Daughenbaugh fall to the ground and get beaten.

On first-degree murder, the jury was instructed that they could find Tyler guilty as a principal or under an aiding and abetting or joint criminal conduct theory. Thus, the instruction read as follows:

> The State must prove all of the following elements of Murder in the First Degree:
>
> 1. On or about August 25, 2013, the defendant, individually or through joint criminal conduct or through aiding and abetting another and without justification, assaulted Richard Daughenbaugh.
>
> 2. Richard Daughenbaugh died as a result of the assault.
>
> 3. The defendant, individually or through joint criminal conduct or someone he aided and abetted, acted with malice aforethought.
>
> 4. The defendant, individually or through joint criminal conduct or someone he aided and abetted, acted willfully, deliberately, premeditatedly and with a specific intent to kill Richard Daughenbaugh.

The court's second-degree murder instruction restated these same elements, except it omitted the fourth element of a specific intent to kill.

---

[2]We refer to the juvenile witnesses by initials only.

The jury acquitted Tyler of first-degree murder, but found him guilty of second-degree murder. *See id.* § 707.3. It did not reach the remaining lesser included offenses. The court overruled Tyler's motions for judgment of acquittal and for new trial and sentenced Tyler to fifty years imprisonment. *See id.* § 707.3; *id.* § 902.12(1).

Tyler appealed, arguing there was insufficient evidence to support his conviction on any of the three murder theories. In addition, Tyler asserted the district court erred in admitting B.B.'s testimony that when the group formed around Daughenbaugh including Tyler, Shorter, Russell, and Williams, B.B. wanted to leave because after having seen them fight in the past, she thought fighting was going to happen again.

We transferred Tyler's appeal to the court of appeals. That court reversed Tyler's second-degree murder conviction, finding insufficient evidence to support any of the three theories advanced by the State at trial—i.e., principal liability, aiding and abetting, or joint criminal conduct.[3] One member of the panel dissented and would have found sufficient evidence to support the aiding and abetting and joint criminal conduct theories. We granted the State's application for further review.

## II. Standard of Review.

As we explained recently,

> We review sufficiency-of-evidence claims for correction of errors at law. In reviewing the evidence, we view the evidence in the light most favorable to the State. "[W]e will uphold a verdict if substantial evidence supports it." "Evidence is considered substantial if, when viewed in the

---

[3]It is not clear why the court of appeals remanded for entry of a judgment of acquittal instead of just vacating the second-degree murder conviction and remanding for further proceedings. There was clearly sufficient evidence to support a conviction on some of the lesser included offenses as to which the jury had been instructed but did not reach, even if the evidence were deemed insufficient to sustain a second-degree murder conviction.

light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt."

*State v. Rooney*, 862 N.W.2d 367, 371 (Iowa 2015) (citations omitted) (quoting *State v. Sandford*, 814 N.W.2d 611, 615 (Iowa 2012)). "We review evidentiary rulings regarding the admission of prior bad acts for abuse of discretion." *State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014).

### III. Sufficiency of the Evidence.

For reasons that will be discussed below, we must address all three theories of criminal liability that were presented to the jury. We should be clear at the outset what Tyler does and does not challenge. He does not dispute there was substantial evidence that he threw the first punch that knocked Daughenbaugh to the ground.

**A. Liability as a Principal**. On the individual liability theory, Tyler challenges only the State's evidence of causation. He does not dispute the State presented substantial evidence on the other elements, including malice aforethought.

To find Tyler guilty on a theory of individual liability, the jury had to conclude that Tyler's own personal assault on Daughenbaugh *caused* Daughenbaugh's death.[4] While there is certainly evidence that Tyler started a chain of events by punching Daughenbaugh in the face and knocking him to the ground, the autopsy indicated that none of the blows to Daughenbaugh's head were fatal. Rather, Daughenbaugh died as a result of tears in his mesentery that occurred when members of the group stomped and kicked on his abdomen when he was down. Tyler relies on these facts to urge that an individual liability theory of guilt should not have been submitted to the jury.

---

[4]The jury was not given a separate instruction on causation.

The State responds in two ways. First, on this record, it argues the jury was entitled to find that Tyler participated in the kicking and stomping. Second, it argues that without Tyler's initial punch, Daughenbaugh would have not have been rendered helpless and then killed by the subsequent kicking and stomping. In other words, Tyler's initial punch was a but-for cause of Daughenbaugh's death.

The first of these arguments does not convince us. No witness testified that Tyler (or someone identified through other testimony as Tyler) was one of the persons kicking or stomping on Daughenbaugh's abdomen. True, substantial evidence exists that Tyler remained in the group circling Daughenbaugh after Daughenbaugh fell.[5] But everyone agreed there were a number of individuals in that group, and to draw the inference that Tyler delivered one of the fatal blows requires guesswork and speculation.

However, we find the State's alternative argument more persuasive. In our recent decisions addressing questions of causation in criminal law, we have applied the Restatement (Third) of Torts. Thus, in *State v. Tribble*, 790 N.W.2d 121, 126–27 (Iowa 2010), we cited the Restatement (Third) of Torts: Liability for Physical and Emotional Harm §§ 26–27, at 346, 376 (Am. Law. Inst. 2010) [hereinafter Restatement (Third)] as well as our opinion in *Thompson v. Kaczinski*, 774 N.W.2d 829, 836–39 (Iowa 2009). We said,

> When causation does surface as an issue in a criminal case, our law normally requires us to consider if the criminal act was a factual cause of the harm.

---

[5]One of the teenagers, L.S., testified that she saw "the kid hit [Daughenbaugh] and then walk off." But she was the only witness to so testify and Perkins testified to the contrary.

> The conduct of a defendant is "a factual cause of harm when the harm would not have occurred absent the conduct." We have traditionally labeled this straightforward, factual cause requirement of causation the "but for" test. It operates to identify factual causation in each instance, but requires further assistance when multiple acts occur, each of which alone would have been a factual cause in the absence of the other act or acts. This assistance now comes in the form of a legal principle to govern the outcome. When such multiple causes are present, our law declares each act to be a factual cause of the harm.

*Tribble*, 790 N.W.2d at 126–27 (citations and footnote omitted) (quoting Restatement (Third) § 26, at 346).

In *State v. Hennings*, we expressly relied on *Tribble*'s "but for" test in upholding the defendant's hate-crime conviction for driving his pickup truck at a group of African-American boys walking in the street after getting in an argument with them. 791 N.W.2d 828, 835–36, 839 (Iowa 2010). We explained,

> To find a causal connection, the jury need not believe the only motivation for the defendant's acts was the victim's race or other protected status. Instead, to find a defendant guilty under [Iowa Code] section 729A.2, the jury must determine beyond a reasonable doubt the defendant would not have acted absent the defendant's prejudice.

*Id.* at 835. We concluded, "[T]here is substantial evidence Hennings would not have run the boys down with his truck, and run over A.M., except for the boys' race." *Id.*

Then, in *State v. Adams*, we dealt with a case where an allegedly intoxicated motorist ran into and fatally killed a bicyclist who was riding in the same direction as the motorist on a heavily traveled street late at night when the right headlight on the motorist's car was not functioning. 810 N.W.2d 365, 367, 373 n.9 (Iowa 2012). The motorist was convicted of unintentionally causing the death of another by operating a motor vehicle while intoxicated, a Class B felony. *Id.* at 367–68; *see* Iowa Code

§ 707.6A. We indicated that *Tribble* had "clarified" the principles of causation to be applied in a criminal case and said, "Except where multiple acts contribute to cause a consequence, the determination of factual causation turns simply on whether 'the harm would not have occurred absent the [defendant's] conduct.'" *Adams*, 810 N.W.2d at 372 (quoting *Tribble*, 790 N.W.2d at 127). We characterized Adams's case as a "normal" one and stated that "the causation question in a prosecution under Iowa Code section 707.6A(1) asks whether the victim's death would have occurred in the absence of the defendant's criminal act— intoxicated driving." *Id.* We then reserved for possible postconviction proceedings the question whether Adams's counsel had been ineffective in failing to raise as a defense the lack of a causal connection between Adams's alleged intoxicated driving and the victim's death. *Id.* at 372– 74.

There is substantial evidence that Tyler's punch was a but-for cause of Daughenbaugh's death. This blow knocked Daughenbaugh to the ground and he never got up. A reasonable jury could infer that if Tyler had not hit Daughenbaugh, knocked him to the ground, and put him in a position of relative helplessness, he would not have died that night from the stomping and kicking that immediately followed.

Tyler counters that "[c]ausation in the criminal context is not satisfied by simply showing some attenuated set of circumstances by which one could argue there is 'but for' causation," and cites to *State v. Garcia*, 616 N.W.2d 594, 596–97 (Iowa 2000). The *Garcia* decision does not support Tyler, however. For one thing, *Garcia* states that "[t]he principles of causation normally associated with civil tort litigation are pertinent in criminal cases." *Id.* at 596. Those tort principles have evolved in recent years. In 2009, for tort purposes, we adopted the

Restatement (Third) on causation. *See Thompson*, 774 N.W.2d at 839. Then, in a succession of criminal cases in 2010 and 2011, we applied our updated law of tort causation from *Thompson* and the Restatement (Third) in the criminal context. *See Adams*, 810 N.W.2d at 372; *Hennings*, 791 N.W.2d at 835; *Tribble*, 790 N.W.2d at 126–27. In *Adams*, we quoted from *State v. Dalton*, 674 N.W.2d 111, 118 (Iowa 2004), which takes a similar view of causation to *Garcia*, only to distance ourselves from that quotation by explaining how we had clarified the law of criminal causation in *Tribble*. *See Adams*, 810 N.W.2d at 372. Tyler fails to mention, let alone address, our recent criminal caselaw on causation.

Moreover, Tyler's parade of horribles is overstated. Tyler argues that if the State's view of causation were correct, other individuals and entities could be criminally liable for Daughenbaugh's death on a but-for basis. In Tyler's view, this includes the drug dealer for selling methamphetamine to Daughenbaugh, the City of Des Moines for creating a desirable party locale by the Des Moines River, and Daughenbaugh's family for failing to prevent him from drinking and using methamphetamine that night. This line of argument, however, disregards the other elements that would need to be established as a prerequisite to criminal liability, including malice aforethought in the case of murder.

Additionally, the chain of causation here is far from attenuated. A group surrounded Daughenbaugh in what outsiders viewed as a threatening situation; one person in the group, the defendant, struck Daughenbaugh and knocked him to the ground; others in the group promptly kicked and stomped him in the abdomen until he died. Even if "proximate cause" or what we now call "scope of liability" remains part of the State's causation burden in a criminal case, *see Thompson*, 774

N.W.2d at 837, that burden was met here. Substantial evidence exists that a group assault on a mismatched and intoxicated Daughenbaugh was a reasonably foreseeable consequence or within the range of harms of Tyler's initial act of knocking down Daughenbaugh with a punch to his head. *See id.* at 838–39.

Thus, under pre-*Tribble* caselaw, we believe a reasonable juror could find not only that Tyler's blow was a but-for cause of Daughenbaugh's death, but also that it "create[d] the kind of dangerous condition that would make [the ensuing lethal blows] more likely to occur." *Garcia*, 616 N.W.2d at 597 (alteration added) (quoting *State v. Murray*, 512 N.W.2d 547, 550 (Iowa 1994)). To put it another way, a reasonable juror could find that the fatal kicking and stomping was "part of a chain of events set in motion by the assailant's act and leading directly to the victim's death." *Murray*, 512 N.W.2d at 550. "It is not essential for conviction in all cases that the accused actively participated in the immediate physical impetus of death." *State v. Marti*, 290 N.W.2d 570, 579 (Iowa 1980).

Again, accepting the State's version of the facts, after a group surrounded Daughenbaugh, Tyler threw the first punch without provocation, knocking Daughenbaugh to the ground. Others then joined in, kicking and stomping on Daughenbaugh once he was down—thereby killing him. To put it another way, if Daughenbaugh's estate sued Tyler for wrongful death, would the estate be able to get to the jury on the question of causation under either current or former Iowa tort principles? We think the answer is clearly yes. *See State v. Hubka*, 480 N.W.2d 867, 869 (Iowa 1992) ("It is well-established that the definition of 'proximate cause' in criminal cases is identical to its definition in civil cases."); *State v. McFadden*, 320 N.W.2d 608, 613, 616–17 (Iowa 1982)

(finding that "ordinary proximate cause principles" applied to causation in an involuntary manslaughter case and that "the record contains substantial evidence that defendant's participation in a drag race with [the driver of another vehicle] was a concurring proximate cause of the accident in which [the driver of the other vehicle and the driver of a third vehicle] were killed").

Notwithstanding their use of the Restatement (Third) to analyze criminal causation, *Tribble* and *Adams* left open the possibility that criminal causation might still require *more than* proof of but-for factual causation. Thus, in *Tribble* we observed that "[t]he nature of the argument presented by Tribble in this case does not require us to consider the element of causation beyond a factual-cause analysis." 790 N.W.2d at 127 n.1. In *Adams* we likewise said that we "do not address today whether the 'legal cause' aspect of the former proximate cause doctrine has any continuing viability in criminal cases after our decision in *Thompson v. Kaczinski*." 810 N.W.2d at 372 n.7. For reasons we have already discussed, we need not resolve that question today either. Even if criminal causation—unlike tort causation—still embraces notions of proximate or legal cause, we would find that substantial evidence supports a finding of proximate causation in this case.

**B. Liability as an Aider and Abettor**. We now turn to Tyler's potential criminal liability as an aider and abettor. We have said,

> To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission.

*State v. Spates*, 779 N.W.2d 770, 780 (Iowa 2010) (quoting *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000)).[6]

Tyler contends there is insufficient evidence he actively participated in the beating or in some manner encouraged it prior to or at its time of commission. We disagree. While Tyler takes it as an undisputed fact that he walked away after hitting Daughenbaugh, this was the testimony of only one witness, L.S. No one else testified that Tyler left the crowd that had formed around Daughenbaugh. And Perkins testified,

> They started with the one. I think it was the one guy hit his face stomped on his face. They didn't just stomp on his face. They jumped up in the air and stomped on his face like he was a trampoline.

The jury was entitled to find the testimony of Perkins, a Good Samaritan who tried to rescue Daughenbaugh, more credible than that of L.S., a sixteen-year-old who stood by and may have been friends with some of the perpetrators.

Furthermore, Tyler's act of decking Daughenbaugh with a punch to his face after a crowd had surrounded Daughenbaugh could be regarded as encouragement for what subsequently happened—i.e., further beating of Daughenbaugh once he hit the ground. Circumstances matter. Viewing the evidence in the light most favorable to the State, this is not a case where Tyler simply hit someone at random and would have been astonished to see others continue the beating. Rather, a crowd including Tyler encircled Daughenbaugh—an older, intoxicated person who had barged rudely and uninvited into a large teenager party. At that point, Tyler threw the first punch that knocked

---

[6]The jury was given an instruction consistent with this law.

Daughenbaugh down. The State's aiding and abetting theory is that Tyler's punch was at least as much encouragement as a "let's get him" statement would have been.

Perkins testified that when she saw the crowd around Daughenbaugh, she told her boyfriend Berry they shouldn't leave because "something is about to happen." B.B. testified that when she saw the crowd form around Daughenbaugh, she wanted to leave because "I know what's going to happen, and I don't want to be a part of it." A reasonable jury could find that when Tyler struck Daughenbaugh, he expected and intended that others would continue the beating.[7] We find sufficient evidence to support a jury verdict that Tyler aided and abetted in the murder of Daughenbaugh. *See, e.g.*, *Spates*, 779 N.W.2d at 777–78 (finding that a participant in a gun battle between two rival groups could be liable for aiding and abetting the shooting death of a bystander even if the fatal shot was fired by a member of the other group); *Fryer v. State*, 325 N.W.2d 400, 406 (Iowa 1982) (noting that aiding and abetting "may be inferred from circumstantial evidence including presence, companionship and conduct before and after the offense is committed").

In rejecting the aiding and abetting theory in this case, the court of appeals conceded a jury could find that Tyler knew others would assault Daughenbaugh, but questioned the evidence that Tyler intended a *deadly* assault to occur. At oral argument before us, Tyler picked up on this theme, challenging the evidence that he intended Daughenbaugh be killed. This line of argument, however, conflates malice aforethought, which is required for second-degree murder, with a specific intent to kill,

---

[7]The three persons identified at trial as kicking and stomping on Daughenbaugh included Williams, who was Tyler's half-brother. Williams arrived at the party with Tyler and also left with him.

which is only an element of first-degree murder. Tyler was acquitted of first-degree murder.

We recently elaborated on the distinction between malice aforethought and specific intent to kill in *State v. Ceretti*, 871 N.W.2d 88, 93–94 (Iowa 2015), emphasizing that the former concept is broader than the latter. "Malice aforethought requires the actor to have 'a fixed purpose or design to do physical harm to another that exists before the act is committed.'" *State v. Lyman*, 776 N.W.2d 865, 877 (Iowa 2010) (quoting *State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002)). Thus, in *Myers*, we found a factual basis to support a second-degree murder guilty plea in a fatal shaken baby case based on the defendant's admissions that she knew "some" physical harm and "some" injury would occur to the baby. 653 N.W.2d at 579–80; *see also State v. Baratta*, 242 Iowa 1308, 1314, 49 N.W.2d 866, 870 (Iowa 1951) ("It is evident that an assault need not be made with a deadly weapon before malice can be inferred."). There was sufficient evidence from which a jury could infer that Tyler intended others to assault Daughenbaugh and thus, that Tyler had the required mental state of malice aforethought.[8]

**C.  Joint Criminal Conduct**.  Lastly, we consider the State's theory of joint criminal conduct.  Joint criminal conduct is defined as follows:

> When two or more persons, acting in concert, knowingly participate in a public offense, each is responsible for the acts of the other done in furtherance of the commission of the offense or escape therefrom, and each

---

[8]Furthermore, the district court's instruction, to which Tyler did not object, defined "malice aforethought" consistent with the foregoing caselaw: "'Malice aforethought' is a fixed purpose or design to do some physical harm to another which exists before the act is committed." It is settled law that the instructions, if not objected to, become the law of the case. *See State v. Merrett*, 842 N.W.2d 266, 275 (Iowa 2014).

person's guilt will be the same as that of the person so acting, unless the act was one which the person could not reasonably expect to be done in the furtherance of the commission of the offense.

Iowa Code § 703.2.

Joint criminal conduct "contemplates *two* acts—the crime the joint actor has knowingly participated in, and a second or resulting crime that is unplanned but could reasonably be expected to occur in furtherance of the first one." *State v. Rodriguez*, 804 N.W.2d 844, 852 (Iowa 2011). In *Rodriguez*, we found that a guilty plea to vehicular homicide was factually supported on a joint criminal conduct theory. *Id.* at 853. In that case, the defendant was not the driver; however, the defendant was a passenger who had participated in a gas theft by actually pumping the unpaid-for gas. *Id.* at 846. The homicide then occurred when the driver left the gas station at a reckless rate of speed. *Id.* We concluded that the defendant had jointly participated in the first crime—i.e., the gas theft—and the vehicular homicide was a reasonably foreseeable consequence of the quick escape from the scene of the crime that was in furtherance of the original crime. *Id.* at 853.

The court of appeals found that even when the facts are viewed in the light most favorable to the State, Tyler could not have reasonably foreseen that a subsequent beating would occur in furtherance of his initial blow to Daughenbaugh. For reasons we have already discussed, we respectfully disagree. However, we think there is a different evidentiary hole in the State's joint criminal conduct theory. As we discussed in *State v. Smith*, 739 N.W.2d 289, 293 (Iowa 2007), our older caselaw on joint criminal conduct "blurred the line between the commission of a crime by means of aiding and abetting and joint

criminal conduct."[9]  It is now clear that there must be a joint crime in which the defendant participates, followed by a second crime that may have been unplanned but involved reasonably foreseeable conduct in furtherance of the first crime.  *Rodriguez* is a good example of this.

Here the evidence could allow a reasonable jury to find two crimes—i.e., two separate assaults.  But the problem is that the jury also had to have found Tyler acted *in concert* when he committed the first crime, namely, his assault on Daughenbaugh.  Although the question is close, we think this requires too much speculation given this record.  A jury would have to find there was a plan in place among Tyler and others, such as Williams, Russell, and Shorter, to fight Daughenbaugh at the time Tyler struck the first blow.  While the fact that a crowd surrounded Daughenbaugh might be *some* evidence of such a plan, it is not *substantial* evidence.

The State analogizes the present case to *State v. Hohle*, 510 N.W.2d 847 (Iowa 1994), but that is one of those older cases whose vitality has been called into question by *Smith*.  In *Hohle*, the defendant committed an assault individually against Lumbard and then was involved in a follow-up joint assault against Lumbard and Gourdie in which Gourdie was injured.  *Id.* at 848.  The State prosecuted both assaults and the defendant was convicted of both.  *Id.*  The defendant challenged the district court's giving of a joint criminal conduct instruction regarding the Gourdie assault.  *Id.*  In finding that the jury was properly instructed, we emphasized that the second assault was a joint crime, without

---

[9]The problem in *Smith* is not present here.  In that case, there were not two separate crimes, just one—the shooting of the deputy by the cooccupant of Smith's vehicle.  *See Smith*, 739 N.W.2d at 294.  Smith handed the gun to him but did not shoot at the deputy himself.  *Id.* at 291.

addressing whether the *first* assault was a joint crime. *See id.* at 849. However, under our more recent cases like *Smith* and *Rodriguez*, the first crime must be a joint one to support a joint criminal conduct theory and to prevent that theory from simply swallowing aiding and abetting liability.

At oral argument before us, the State offered a different wrinkle to sustain its joint criminal conduct theory. The State asserted that a group decision to surround Daughenbaugh, which would have put Daughenbaugh in fear of immediate, painful physical contact, constituted the first assault and therefore the first crime. *See* Iowa Code § 708.1(2) (defining assault). There are a couple of problems with this formulation of joint criminal conduct. For one thing, we doubt that our unit-of-prosecution precedents allow it. We question whether putting a victim in fear of being hit can be treated as a separate assault from the act of hitting that same victim shortly thereafter. *See State v. Velez*, 829 N.W.2d 572, 579–84 (Iowa 2013) (discussing whether a factual basis existed for two separate counts under Iowa Code section 708.4(1)). This would effectively transform many, if not most, assault cases into double-assault cases. *See id.* at 588 (Wiggins, J., dissenting) (cautioning against "convicting on voluminous and stacked charges"). In addition, the State's oral argument theory was not presented at trial.[10]

---

[10]The State gave the following explanation of joint criminal conduct to the jury in closing argument:

> Instruction Number 21 is what is commonly referred to as joint criminal conduct, and what that contemplates is that an individual in Mr. Tyler's position, the defendant, committed a crime, assault, attacking Mr. Daughenbaugh, striking him in the head, and that he and/or others committed what could arguably be viewed as a second crime, in this case murder, the stomping, kicking, and jumping on Mr. Daughenbaugh, and that the defendant, Mr. Tyler, could have reasonably expected this

**D.   The Need for a New Trial.**   Having found that the joint criminal conduct theory was not supported by the evidence and should not have been submitted to the jury, we must reverse Tyler's conviction and remand for a new trial.   As in *Smith*, "we have no way of knowing whether the jury found [the defendant] guilty . . . as a principal, an aider and abettor, or under the theory of joint criminal conduct."   *See* 739 N.W.2d at 295 (reversing for a new trial where the joint criminal conduct theory should not have been submitted).

The State cites to *Griffin v. United States*, 502 U.S. 46, 56, 112 S. Ct. 466, 472, 116 L. Ed. 2d 371, 380 (1991), for the proposition that a general verdict need not be reversed "because one of the possible bases of conviction was . . . unsupported by sufficient evidence."   The Court explained,

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime.   When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.   Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence . . . .

*Id.* at 59, 112 S. Ct. at 474, 116 L. Ed. 2d at 382–83.

*Griffin* of course is binding on us to the extent it describes a federal due process minimum.   However, the *Griffin* Court also stated that "if the

---

different crime to have occurred and have been committed in furtherance of his assault.

Tyler responded in his closing argument that the first assault could not be the basis for joint criminal conduct because "there is no evidence that that first assault . . . involved anyone other than Kent Tyler."   Based on our review of the record, the jury never considered the possibility that the forming of the circle around Daughenbaugh constituted an assault.

evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration." *Id.* at 60, 112 S. Ct. at 474, 116 L. Ed. 2d at 383. And, as a matter of sound judicial administration, we have decided to go in a different direction in Iowa. In *State v. Hogrefe*, 557 N.W.2d 871, 881 (Iowa 1996), we reversed for a new trial when the jury returned a general verdict and not all the theories were supported by substantial evidence. We explained,

> What we have then is a marshalling instruction that allows the jury to consider three theories of culpability, only one . . . of which is supported by the evidence. With a general verdict of guilty, we have no way of determining which theory the jury accepted. Because there was insufficient evidence to support an instruction to consider *all* the checks, the district court erred in giving the marshalling instruction.

*Id.*; *see also State v. Thorndike*, 860 N.W.2d 316, 321 (Iowa 2015) (collecting cases). This is our precedent and we see no reason to overturn it.[11]

### IV. Admission of B.B.'s Testimony Regarding Fighting.

Because this issue can be expected to come up on retrial, we address Tyler's argument that the district court should not have admitted B.B.'s testimony on Tyler's prior involvement in fighting in

---

[11]We are not alone. Notwithstanding *Griffin*, supreme courts in a number of other states have declined to affirm general verdicts of guilt where at least one of the theories given to the jury was not supported by sufficient evidence. *See, e.g., State v. Jones*, 29 P.3d 351, 373 (Haw. 2001); *State v. Owen*, No. 102,814, 2015 WL 1309978, at *5–6 (Kan. Mar. 13, 2015); *Commonwealth v. Plunkett*, 664 N.E.2d 833, 837 (Mass. 1996); *State v. Adams*, ___ N.E.3d ___, ___, No. 2011–1978, 2015 WL 5728458, at *45 (Ohio, Oct. 1, 2015) ("Ohio is far from an outlier in rejecting *Griffin*."); *Ullery v. State*, 988 P.2d 332, 348 n.48 (Okla. Crim. App. 1999); *State v. Ortega-Martinez*, 881 P.2d 231, 235 (Wash. 1994). *But see Adams*, ___ N.E.3d at ___, 2015 WL 5728458, at *50 (O'Donnell, J., concurring in part and dissenting in part) (citing examples of state supreme courts that follow *Griffin*).

concert with Williams, Russell, and Shorter.[12] When Tyler objected to this testimony, the court held a hearing outside the presence of the jury. An offer of proof took place during which B.B. was examined and cross-examined. B.B. was asked to leave the courtroom and the district court asked Tyler to argue his objection and the State to argue its theory of admissibility. Thereafter, the district court found as follows:

> Well, under any of the three theories of the prosecution, the State has the burden to prove the knowledge and intent of the defendant, and knowledge is particularly important under the theory of aiding and abetting and joint criminal conduct. The State has the burden to prove under the facts of this particular case that not only did the defendant strike the first blow but he knew or could reasonably expect that the first blow would be followed by assaults of his accomplices.

> The witness who was present observing all of this knew based on her prior experience with this defendant and his brother, Leprese [Williams], just that same summer at a similar party under similar circumstances that there was going to be a fight based on what she was observing. That is very strong evidence, it seems to me, that the defendant himself knew or could reasonably expect that by confronting this person who turned out to be the victim and allegedly, at least at this point, striking the first blow that a fight was going to follow. A person intends the natural consequences of their act.

> So the evidence in my mind at least is highly probative of the defendant's knowledge and intent. The evidence is not being offered to show that the defendant has a bad character and acted in conformity therewith on this particular occasion. The evidence is being offered to show proof of

---

[12]In the offer of proof, B.B. testified she had seen Tyler, Williams, Russell, and Shorter hang out together and had seen Tyler and Williams fight people and Russell and Shorter fight people, but not all four of them fight at once. According to B.B.'s offer of proof testimony, the incident that she witnessed involving Tyler and his half-brother Williams occurred in the summer of 2013, shortly before Daughenbaugh was killed. Before the jury, B.B. simply testified that when she saw the group including Tyler, Williams, Russell, and Shorter surround Daughenbaugh, she wanted "to get out of there" because she had seen these people engage in fighting before and "didn't want to be a part of it." We believe any differences in the offer of proof record and the trial record are not material to our evaluation of the district court's evidentiary ruling.

motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident, and that is allowed under rule 404(b).

There is a question whether the probative value of this evidence would be substantially outweighed by the danger of unfair prejudice to the defendant or confusion of the issues or misleading the jury or by considerations of undue delay or waste of time or the needless presentation of cumulative evidence under Rule 5.403. But performing that balance, the Court thinks that the—or finds that the substantial probative value of this evidence on an essential element of the charge is not substantially outweighed by the danger of unfair prejudice or the other considerations of the rule.

This evidence is available to the State. There is a witness who was present at the scene of the crime who had knowledge and a feeling that something like this was going to happen, and it did. If she knew that based on what she knew of this defendant, one could reasonably infer that the defendant knew it too. And so I believe this evidence is relevant under the rules and it is admissible, and the objections will be overruled.

The district court did not abuse its discretion in this thorough and comprehensive ruling. Because the ruling is largely self-explanatory and consistent with our caselaw,[13] we add only a few observations. First, the

---

[13]As we have said,

To be admissible, the prosecutor must articulate a noncharacter theory of relevance. The court then must determine whether the other crimes, wrongs, or acts evidence is relevant and material to a legitimate issue in the case, other than a general propensity to commit wrongful acts. If the court determines the evidence is relevant to a legitimate issue in dispute, the court must determine whether the probative value of the other crimes, wrongs, or acts evidence is substantially outweighed by the danger of unfair prejudice to the defendant. In determining whether the probative value of other crimes, wrongs, or acts evidence is substantially outweighed by the danger of unfair prejudice, the court should consider

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

If the evidence's probative value is substantially outweighed by its unfair prejudice, it must be excluded.

evidence that *Tyler* struck Daughenbaugh first with a blow to the head was fairly strong, and the evidence that *others* in the surrounding crowd then stomped and kicked him to death was also fairly strong. Thus, it is less likely that this evidence would have served, or needed to serve, an improper "propensity" purpose—i.e., because Tyler fought before, he was fighting that night. At the same time, the State's evidence was not as strong concerning the foreseeability to Tyler of others beating on Daughenbaugh once Tyler hit him. B.B.'s testimony helped shore up that area of the State's case. This is one legitimate use of other "bad acts" evidence—to prove the defendant's knowledge and intent. *See* Iowa R. Evid. 5.404(*b*); *State v. Nelson*, 791 N.W.2d 414, 425 (Iowa 2010). We affirm the district court on this point.

**V. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals. We reverse Tyler's conviction and sentence and remand for a new trial in accordance with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED.**

---

*State v. Nelson*, 791 N.W.2d 414, 425 (Iowa 2010) (citations omitted) (quoting *State v. Taylor*, 689 N.W.2d 116, 124 (Iowa 2004)).