# IN THE COURT OF APPEALS OF IOWA

No. 15-0472
Filed November 9, 2016

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**MICHAEL DAVID SCHENK,**
      Defendant-Appellant.

_____

Appeal from the Iowa District Court for Crawford County, John D. Ackerman, Judge.

Michael Schenk appeals from his convictions for two counts of first-degree murder as an aider and abettor. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sheryl A. Soich, Assistant Attorney General, for appellee.

Heard by Danilson, C.J., and Doyle and McDonald, JJ.

**DANILSON, Chief Judge.**

Michael Schenk appeals from his convictions for two counts of first-degree murder as an aider and abettor, in violation of Iowa Code sections 707.1 and 707.2(1) (2013), in the deaths of Marvin Huelsing and Alice Huisenga.[1]  Schenk asserts the district court erred in admitting duplicate evidence, there is insufficient evidence to support the convictions for first-degree murder as an aider and abettor, and the convictions were contrary to the weight of the evidence. Because we find the district court did not abuse its discretion in admitting duplicate evidence, the district did not error in overruling the motion for judgment of acquittal as there was sufficient evidence supporting the convictions, and the district court did not abuse its discretion in denying the motion for new trial as the convictions were not contrary to the weight of the evidence, we affirm.

**I. Background Facts & Proceedings.**

The facts as presented at trial reflect that in the early morning hours of March 10, 2014, Michael Schenk, Jayden Chapman, and Erika Dains met, used methamphetamine, and rode in Schenk's blue extended-cab truck to a farm belonging to Marvin Huelsing, with the intent to steal scrap metal.  Dains testified while they were driving around the farm property collecting various items, including steel posts, the truck got stuck in the mud.  Efforts to pull the truck out of the mud were unsuccessful, and it was beginning to become light outside. Schenk and Chapman walked up towards the area of the property where a mobile home was located to try to find something to help extract the truck from

---

[1] Schenk was also convicted of second-degree arson, in violation of sections 712.1 and 712.3, but does not appeal that conviction.

the mud.  Dains, who had remained with Schenk's truck, heard a man yell, "I'm going to call the sheriff" followed by the sound of a gunshot.  Dains testified she saw Chapman drive a "little truck"—later identified as belonging to Huelsing—around the side of the mobile home, stop, and get out.  Dains then saw Schenk approach the truck and put a "long" gun in the cab.  Schenk then ran down to where Dains was located.  Dains testified Schenk was crying and stated, "I had to shoot him, I had to shoot him.  I had no choice."

Chapman then drove the small truck down, and Schenk placed the long gun in his truck.  At that time, Dains noticed a purse in the small truck.  The purse belonged to Alice Huisenga, who was a long-time friend and farming partner of Huelsing.  Huisenga would accompany Huelsing to the farm several times a week to help Huelsing on the farm or have coffee in the mobile home.

Schenk, Chapman, and Dains then rode in the small truck back towards the area of the property near the mobile home to again try to find something to help get Schenk's truck out of the mud.  Dains saw a man lying on the ground near the mobile home "with blood bubbles coming out of his mouth."  Schenk approached the man and took his wallet, ID, and cellphone.  Dains testified while Schenk was leaning over the man, she heard Schenk say he was not dead and then Schenk and Chapman leaned over the body whispering.  Dains, Schenk, and Chapman then drove the small truck back down near Schenk's truck and were finally able to extract Schenk's truck from the mud using chains.

After discussing the need to "get rid of it," Schenk and Chapman lit the small truck on fire.  Schenk's truck was then driven back to the top of the property near the mobile home.  While Dains waited in Schenk's truck, Schenk

went into the mobile home, came out carrying gas cans, and placed them in the truck near Dains, along with the gun and "some clothing-looking things." After Schenk came out of the mobile home, Dains saw flames coming from the structure. She testified that prior to setting fire to the mobile home, Schenk made a comment about his "sweat and the shells, the gun shells" being inside. Schenk, Chapman, and Dains then left the property. They retrieved Dains' car and she followed Schenk and Chapman to Derek Olbertz's house.

Olbertz testified he saw Schenk, Chapman, and Dains on the morning of March 10, 2014, trying to unload items into his backyard and he told them they could not leave the scrap metal there. He testified Schenk smelled of gasoline and "like being around a campfire, . . . like burnt rubber." Dains testified that while at Olbertz's house, Schenk and Chapman moved the gun, clothing items, and gas cans to her car. Dains then took Chapman to the hotel where he was staying, and Chapman unloaded the gun, clothing items, and gas cans.

A fire was reported and officers arrived at Huelsing's farm on the afternoon of March 10, 2014. Officers found Huelsing's badly-burned body near the mobile home. After the fire subsided, a body—later identified as Huisenga's—was found inside the mobile home. The medical examiner testified Huelsing sustained two gunshot wounds to his chest, one to his back, and one to the back of his head. The medical examiner stated Huisenga likely had sustained one to four gunshot wounds, based on evidence of internal lacerations and skull fractures.

A witness who drove by Huelsing's farm on the way to school every day came forward after news of the incident spread. She testified that on the

morning of March 10, 2014, she saw two "skinny" men standing near a blue truck on Huelsing's property.

While searching the farm property in the days following the incident, officers located a Walmart receipt on the ground. The information on the receipt was tracked to Schenk's debit card. Walmart video surveillance showed the person who made the purchase drive away in a blue truck.

On March 12, 2014, Schenk and Chapman went to Dains' house. She testified they were worried, said they were going to Mexico, and told her not to tell police officers anything she knew. While Schenk and Chapman were at her house, officers arrived and arrested them.

In an interview with officers, Schenk provided information leading the officers to find the items left near the motel where Chapman was residing, including a rifle and ammunition, clothing, and items belonging to Huelsing and Huisenga. Huelsing's blood was found on the rifle. Schenk's right thumb print was found on the bag containing the ammunition. Additionally, a pair of jeans found with the other items was determined to have Schenk's DNA on the waistband. Huelsing's DNA was extracted from a spot of blood found on the back of one of the legs of those jeans.

On March 21, 2014, Schenk was charged by trial information with two counts of first-degree murder and one count of first-degree arson. On January 28, 2015, a jury returned guilty verdicts on two counts of first-degree murder, as an aider and abettor, and one count of second-degree arson. Although the jury could have found Schenk was the principal actor, the jury answered an

interrogatory wherein they stated their verdict was premised upon the unanimous finding that Schenk aided and abetted the murders. Schenk now appeals.

## II. Standard of Review.

"We review the district court's evidentiary rulings for an abuse of discretion." *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013). Sufficiency-of-evidence claims are reviewed for correction of errors at law. *State v. Tyler*, 873 N.W.2d 741, 746 (Iowa 2016). And "[w]e review a district court's ruling as to whether a verdict was contrary to the weight of the evidence for an abuse of discretion." *Thompson*, 836 N.W.2d at 476.

## III. Analysis.

*A. Admission of Receipt.* Schenk first contends the district court erred in denying his motion in limine and allowing admission of the Walmart receipt at trial. After photos were taken documenting the contents and condition of the receipt, it was destroyed by fingerprint testing. Schenk contends admission of the photographs of the receipt was unfair and constituted improper admission of duplicate evidence.[2]

Iowa Rule of Evidence 5.1003 provides, "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) under the circumstances, admission of the duplicate would be unfair." As the district court noted, Schenk has not raised a "claim that somehow the picture is not a true and accurate depiction of what the receipt was before the testing." Rather, Schenk argues admission of the

---

[2] "A 'duplicate' is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, . . ." Iowa R. Evid. 5.1001(3).

photographs of the receipt was unfair because the defense never had the opportunity to compare the photos to the original receipt before it was destroyed.

An "original is not required and other evidence of the contents of a writing, recording, or photograph is admissible if . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." Iowa R. Evid. 5.1004(1). Because Schenk does not claim and has not shown the destruction of the receipt by testing was in bad faith, nor does he dispute the photographs are accurate depictions of the receipt prior to testing, we find the district court did not abuse its discretion in admitting the photographs of the receipt at trial. The admission of the photographs of the receipt did not prejudice Schenk, and thus was not unfair, because they were cumulative evidence. The receipt only connected Schenk to the scene and ultimately to his truck by the Walmart video. The purchase reflected on the receipt was insignificant. Other evidence presented at trial, including the eye witness testimony of two men near a truck matching the description of Schenk's truck on the property, the testimony of Erika Dains, and the DNA evidence placed Schenk at the scene on the morning of the incident. Schenk also does not argue the original was required for these proceedings, nor do we know of any such requirement.[3] Moreover,

---

[3] Iowa Rule of Evidence 5.1004 provides:

> The original is not required and other evidence of the contents of a writing, recording, or photograph is admissible if:
> (1) *Originals lost or destroyed.* All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or
> (2) *Original not obtainable.* No original can be obtained by any available judicial process or procedure; or
> (3) *Original in possession of opponent.* At a time when an original was under the control of the party against whom offered, that party was put on notices, by the pleadings or otherwise, that the contents would be

Schenk did not suggest he was unable to obtain a copy of the receipt from Walmart.

*B. Sufficiency of the Evidence.* Schenk also asserts the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence to support Schenk's convictions for first-degree murder as an aider and abettor.

In reviewing the sufficiency of the evidence for correction of errors at law, "we view the evidence in the light most favorable to the State" and uphold the verdict "if substantial evidence supports it." *Tyler*, 873 N.W.2d at 746-47 (citation omitted). "Evidence is considered substantial if . . . it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* at 747 (citation omitted). In evaluating a sufficiency-of-the-evidence claim:

> Direct and circumstantial evidence are equally probative. A jury is free to believe or disbelieve any testimony it chooses and to give as much weight to the evidence as, in its judgment, such evidence should receive. . . . A jury's assessment of credibility may only be ignored on appeal when the testimony is so impossible, absurd, and self-contradictory that it may be deemed a nullity.

*State v. Speaks*, 576 N.W.2d 629, 632 (Iowa Ct. App. 1998) (internal citations omitted).

"To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner

a subject of proof at the trial or hearing, and that party does not produce the original at the trial or hearing; or
  (4) *Collateral matters.* The writing, recording, or photograph is not closely related to a controlling issue.

encouraging it prior to or at the time of its commission." *Tyler*, 873 N.W.2d at 750 (citations omitted).

Schenk contends the State has not shown "anything more than mere presence at the scene of the crime and association with Chapman." Schenk argues there is insufficient evidence to show he aided and abetted Chapman in committing the murders.

> While the mere presence of [the defendant] at the scene of the crime does not prove that he aided and abetted its commission, aiding and abetting need not be shown by direct proof. It may be inferred from circumstantial evidence including presence, companionship and conduct before and after the offense is committed.

*Fryer v. State*, 325 N.W.2d 400, 406 (Iowa 1982) (citations omitted). The jury was instructed as to this standard in Jury Instruction 16:

> "Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting." Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting."

Schenk cites to *Tyler*, and raises the distinction between a theory of aiding and abetting and joint criminal conduct. 873 N.W.2d at 752 (noting that under a theory of joint criminal conduct, there is "a joint crime in which the defendant participates, followed by a second crime that may have been unplanned but involved reasonably foreseeable conduct in furtherance of the first crime"). Schenk argues that he may have been involved in scrap metal theft and arson but the circumstantial evidence along with any statements about fleeing the

country do not necessarily implicate him in aiding and abetting the two murders. We disagree. We find substantial evidence, albeit circumstantial evidence, in the record supports Schenk's knowledge of and active participation in the murders.

Eyewitness testimony placed two men and a truck matching the description of Schenk's truck on the property at the time the crimes were committed. The receipt found on the property also placed Schenk at the scene. Dains' testimony also placed Schenk at the scene, and she observed both Schenk and Chapman approach the area of the mobile home. About one and half hours later she heard a man yell, "I'm going to call the sheriff." Immediately after hearing the man yell, she heard a gunshot. She then saw Schenk place a gun in the small truck. Dains testified Schenk's demeanor was shaken; he was crying and he admitted to shooting a man.

After returning to the area of the mobile home in the small truck, Dains saw Schenk take a wallet, identification information, and a cell phone from Huelsing's person while he lay on the ground. Dains stated Schenk and Chapman broke two cell phones, including the phone Schenk took from Huelsing's person. She also heard Chapman tell Schenk "we" have to start the small truck "on fire or something," to which Schenk responded, "yeah I know." She then observed the small truck on fire. Dains also observed Schenk enter the mobile home and heard Chapman say, "hurry up." Before Schenk entered the mobile home he commented that his sweat and the shells could be found inside. After five or ten minutes, she saw Schenk exit the mobile home with gas cans and later saw the mobile home in flames. At some point, Dains was told by Chapman, "I had to take control because [Schenk] couldn't go through with it."

The same morning, Olbertz testified Schenk attempted to leave scrap metal at Olbertz's property. Olbertz noted that Schenk smelled of gasoline and burnt rubber. Dains testified that on March 12 when Schenk and Chapman were at her house prior to being arrested there by officers, Schenk stated "they couldn't live here anymore and that they were going to Mexico." Dains also testified Schenk "told me that cops would come and question me and [told] me just to say I don't know nothing."

Schenk later led officers to the location of incriminating evidence including the rifle with Huelsing's blood on it, the bag of ammunition with Schenk's fingerprints on it, items belonging to Huelsing and Huisenga, broken pieces of two cell phones, and the jeans containing both Schenk's DNA and Huelsing's blood.

The evidence reflects Schenk assented to or lent countenance and approval to the murders at the time they were committed and engaged in conduct following the murders to conceal the crimes. Although Dains did not observe who fired the rifle, there is ample circumstantial evidence of Schenk's participation as an aider and abettor in the murders. Schenk and Chapman were working together to steal scrap metal, walked to the mobile home together, communicated with each other over the body of Huelsing, discussed setting fire to the small truck, and worked to extract Schenk's vehicle. Schenk drove to and from the scene of the crimes. Schenk was observed in possession of a rifle at the scene. Both Huelsing and Huisenga were shot and killed. Although there is direct evidence of Schenk's involvement in the theft and arson, we nonetheless determine the circumstantial evidence convincingly supports his involvement as

an aider and abettor to the murders of Huelsing and Huisenga. Unlike joint criminal conduct where the second crime involves reasonably foreseeable conduct, here, Schenk was present at the scene, a companion with Chapman, and knowingly participated in acts before, during, and after the murders to aid in their commission. We therefore find there is sufficient evidence to support Schenk's convictions for first-degree murder as an aider and abettor, and we hold the district court did not err in denying the motion for judgment of acquittal.

*C. Weight of the Evidence.* Schenk alternatively contends the district court abused its discretion in denying his motion for new trial because the verdict was contrary to the weight of the evidence.

"On a motion for new trial, . . . the power of the court is much broader [than on a motion for judgment of acquittal]. It may weigh the evidence and consider the credibility of witnesses." *State v. Maxwell*, 743 N.W.2d 185, 192 (Iowa 2008) (citation omitted). "The district court has broad discretion in ruling on a motion for new trial." *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). "[T]he power to grant a new trial on this ground should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Maxwell*, 743 N.W.2d at 192 (citation omitted).

Upon the understanding that a motion for new trial "is addressed to the discretion of the court which should be exercised with caution and should be invoked only in the exceptional case in which evidence preponderates heavily against the verdict," the district court denied the motion for new trial. The court found that the verdict was not contrary to the weight of the credible evidence. We acknowledge there are reasons to withhold weight from the testimony of

Dains, such as the plea offer tendered to her,[4] but she also acknowledged facts contrary to her interests, and based on the facts as set forth above, we find the district court did not abuse its discretion in denying the motion for new trial.

**IV. Conclusion.**

We find the district court did not abuse its discretion in admitting duplicate evidence, the district court did not err in finding sufficient evidence to support Schenk's convictions for first-degree murder as an aider and abettor, and the district court did not abuse its discretion in denying the motion for new trial based on its finding the verdict is not contrary to the weight of the evidence. We therefore affirm.

**AFFIRMED.**

---

[4] At the time of Schenk's trial, Dains had entered pleas pursuant to a plea agreement to burglary in the second degree and accessory after the fact and was in custody but was awaiting sentencing.