# IN THE COURT OF APPEALS OF IOWA

No. 17-0549
Filed May 2, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ROBERT E. SINN,**
        Defendant-Appellant.
_____


Appeal from the Iowa District Court for Henry County, Michael J. Schilling, Judge.


Defendant challenges his conviction and sentence for sexual abuse in the third degree.  **AFFIRMED.**


Mark C. Smith, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sheryl A. Soich, Assistant Attorney General, for appellee.


Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**MCDONALD, Judge.**

Robert Sinn appeals his conviction for sexual abuse in the third degree, in violation of Iowa Code section 709.4 (2016). Sinn raises two arguments on appeal. He contends the district court erred in declining to give his requested spoliation instruction. He also argues there is insufficient evidence to support his conviction.

I.

In August 2016, Sinn was temporarily staying with C.W., his former partner and mother of his seventeen-year-old daughter S.S. During his stay with C.W., Sinn repeatedly propositioned C.W. for fellatio and sexual intercourse. On one occasion, he exposed his penis to her and asked her to perform oral sex. She declined his repeated advances. On the night of August 4, C.W. testified she drove Sinn to the bar for drinks because Sinn was not licensed to drive. While out with Sinn, C.W. consumed four drinks. C.W. testified she had no recollection of any events after consuming her last drink until she awoke and found herself lying on her stomach in a ditch. She testified her head was inside a metal pipe, it was raining, she was cold, and she felt pain in her eye and vagina. She was naked from the waist down—wearing only a shirt but no underwear, shorts, or shoes. C.W. clawed her way up the muddy ditch, walked to a nearby home, and banged on the door. The homeowner answered the door. The homeowner testified C.W. was hysterical and covered in mud. He called the police. Then he took C.W. into the bathroom and placed her in the shower because she was so caked in mud she was having trouble seeing.

C.W. was taken to the Henry County Health Center. She was treated and released, but she came back later in the day because she was having anxiety and

suffering pain in her ribs. The examining physician testified C.W. had suffered trauma to her face and head. Her eye was bruised and almost swollen shut. C.W. had scratches and abrasions on her lower extremities. C.W. reported pain in her vaginal area. The physician noted an area of abrasion on the vaginal introitus that appeared to be recent. The physician completed a rape kit. There was no semen detected. The doctor believed C.W. had been assaulted with possible penetration of the vagina. Bloodwork tested positive for the presence of alcohol and marijuana but no other substances.

S.S., Sinn and C.W.'s daughter, was living with Teresa Roberts, C.W.'s neighbor. S.S. testified when she got home from work, Sinn was at Roberts' house. He was nervous and soaking wet. He told S.S. four different versions of the events of the evening, but all of the versions ended with C.W. being left in the ditch because, according to Sinn, C.W. got out of the car and refused to get back in. Nonetheless, S.S. did not go search for C.W., concluding her mother would call if she needed help. S.S. testified Sinn later asked her "if Mom had a black eye," which caused S.S. to grow concerned. S.S. testified she saw Sinn with a little blue pill earlier in the day. He called the pill "his happy pill."

Roberts testified Sinn woke her up that evening around 11 p.m. He was wet and pacing. He told her he was with C.W. and C.W. had gotten out of the car to vomit. Sinn told Roberts C.W. would not get back in the car so he left C.W. in a ditch. He told Roberts C.W. did not have her phone because it was in his car. He also told Roberts he saw C.W. "being handsy" with a man at the bar earlier in the evening and appeared upset by this. Roberts gathered up a friend of her son and

went to go look for C.W. They looked for approximately one hour, but they did not find her.

New London Assistant Chief of Police Brandon Fowler spoke with Sinn on the night in question. Officer Fowler initially went to C.W.'s residence to conduct a welfare check on C.W.'s ten-year-old son, who was at home alone. After speaking to C.W.'s son, Fowler went to Roberts' house to ask her some questions. Fowler learned Sinn was at Roberts' house, and he asked for Sinn to come outside and speak with him. Sinn did, and Fowler asked him where he had been and with whom. Fowler testified Sinn kept asking over and over again if C.W. was all right and repeating "he hoped he wasn't in any trouble for this." Sinn told Fowler C.W. had gotten drunk and performed oral sex on him while Sinn drove around. Sinn told Officer Fowler C.W. exited the car after the two fought and fell down "like three different times." Fowler testified Sinn told him he tried helping C.W. into the car but could not so he left her there to try and get help. At this time, Fowler had not yet told Sinn C.W. was found and at the health center.

Henry County Deputy Sheriff Jesse Bell also interviewed Sinn on the night in question. Deputy Bell had been at the health center with C.W., but he left when he learned Fowler had located Sinn at Roberts' house. Sinn initially told Deputy Bell C.W. left the bar with another man. Sinn told the deputy he got a ride home with a cousin. Deputy Bell told Sinn he believed C.W.'s phone was in Sinn's car, and Bell asked if they could retrieve it. Sinn consented. The deputy observed a brown sandal on the passenger floorboard. Sinn located the matching sandal and C.W.'s phone in the backseat and gave them to Deputy Bell. The phone had mud stuck to it. The deputy walked around the vehicle and shined his flashlight through

the window. He observed jean shorts on the driver's side in the backseat. Sinn consented to the deputy taking the shorts out of the vehicle. The shorts were wet and muddy. Sinn told Deputy Bell the shorts belonged to him and the shorts were wet and muddy because Sinn had fallen down while wearing them. The shorts were women's shorts, and the deputy concluded the car was part of the crime scene and secured the vehicle to be searched pursuant to a warrant. Upon searching the vehicle later, the authorities found a pair of women's underwear in the backseat. C.W.'s driver's license was in the pocket of the denim shorts. C.W. later identified the underwear, shorts, and sandals as the clothing she wore that night. Deputy Bell observed Sinn had white gravel and dirt caked onto his jeans.

After Deputy Bell told Sinn he did not believe his story, Sinn's version of events changed. Sinn stated he and C.W. left the bar together and drove around while C.W. performed oral sex on him. Sinn said the two tried to have sex but were too drunk. At some point, according to Sinn, C.W. exited the vehicle because they were arguing or because she needed to vomit. She refused to get back into the vehicle. Sinn told police he left C.W. there and went to get help. He said he did not call anyone for help because "he doesn't use his phone." He was adamant he and C.W. did not have sexual intercourse. Sinn also said he lied initially because he was afraid he would be in trouble for leaving C.W. on the side of the road.

Sinn also gave the deputies a cell phone he pulled from his pocket. Sinn did not know to whom it belonged, but he stated he must have got it at the bar. It was determined the phone belonged to Troy Stith, the owner of one of the bars Sinn and C.W. went to on the night in question. Stith told police he asked C.W. to

leave the bar because she appeared very intoxicated. She groped Stith and then tripped over a barstool. Stith reviewed surveillance footage from the bar, which showed C.W. took his phone when she groped him and handed it to the bartender, who gave it to Sinn. The bar did not retain the footage.

Two persons from the jail testified at trial. The first was the jail administrator. She testified Sinn spoke to her after Sinn's initial appearance in the case. He was upset and said "that he didn't know how he could get this—this charge from just getting a blow job from some girl." Christopher Conrad, who shared a jail cell with Sinn, testified at trial. Conrad had already resolved his case and was serving his sentence in jail. He did not ask for nor receive any benefit for his cooperation. He claimed he came forward because a relative had been raped. Conrad testified Sinn told him he forced a woman into the car with him and drove her around while he waited for the drugs he had given her to take effect. Sinn said he took the woman to a gravel road where no one was around. Sinn told Conrad he punched the woman and knocked her unconscious. Conrad testified Sinn told him he "took advantage of her, took her-- tore her panties off and scratched her p*ssy." He also "made her suck his d*ck." Sinn said he took the woman's phone and "left the b*tch for dead."

Sinn was charged with theft and sexual abuse in the second degree as a habitual offender. The district court granted Sinn's motion for judgment of acquittal on the theft charge. The jury found Sinn guilty of the lesser included offense of sex abuse in the third degree. The district court sentenced Sinn to an indeterminate term not to exceed fifteen years as a habitual offender.

II.

Sinn argues the district court erred in concluding he was not entitled to a spoliation instruction relating to the unavailability of the bar surveillance footage. This court reviews the refusal to give a spoliation instruction for errors at law. *See State v. Hartsfield*, 681 N.W.2d 626, 630 (Iowa 2004). The district court does not have discretion to refuse a spoliation instruction when there is sufficient evidence in the record to generate a jury question on the spoliation inference. *See id.*

"A spoliation instruction is a direction to the jury that it [may] infer from the State's failure to preserve [evidence] that the evidence would have been adverse to the State." *Id.* To justify a spoliation instruction, substantial evidence must show: "(1) the evidence was in existence; (2) the evidence was in the possession of or under control of the party charged with its destruction; (3) the evidence would have been admissible at trial; and (4) the party responsible for its destruction did so intentionally." *Id.* (citing *State v. Langlet*, 283 N.W.2d 330, 335 (Iowa 1979)). Even if a spoliation instruction should have been given, we will not reverse the judgment of the district court if no prejudice occurred. See *id.* at 633 ("Instructional error is not reversible error unless there is prejudice."). "Prejudice exists when the rights of the defendant have been injuriously affected or the defendant has suffered a miscarriage of justice." *Id.*

The district court did not err in declining to give Sinn's proposed spoliation instruction. Sinn failed to establish the State was ever in possession or control of the surveillance footage. A deputy did view the surveillance footage and asked Stith for a copy. Law enforcement followed up with Stith on several occasions, but Stith did not make a copy of the footage because he did not know how. When

Stith was deposed pretrial, he stated he thought the footage was still available. By the time of trial, however, the footage had been automatically recorded over and was no longer available. Stith is not the State, and he is not a party to this case. *See State v. Majerus*, No. 16-1000, 2017 WL 4570361, at *5–6 (Iowa Ct. App. Oct. 11, 2017) (holding declination of spoliation instruction not erroneous where the State failed to obtain surveillance footage from a third party). Stith's possession of the surveillance footage is not the State's possession of the same. Nor can the State be charged with intentionally failing to take possession of the footage "in order to avail itself of the third-party possessor's neutral record destruction policy." See *State v. Schrock*, No. 13-1832, 2014 WL 5243444, at *2 n.4 (Iowa Ct. App. Oct. 15, 2014).

In addition, there is no evidence of intentional destruction of the surveillance footage. Stith testified that he did not understand how to burn a copy of the footage and that the footage was overwritten in the normal course. "Ordinarily evidence destroyed under a neutral record destruction policy is not considered intentionally destroyed so as to justify a spoliation instruction." *See Hartsfield*, 681 N.W.2d at 632. We recognize that the State's knowing failure to preserve the video could satisfy this prong of the four-part test. *Id.* at 633. However, Stith believed the video would be available for trial. There is no evidence the State had a reason to believe to the contrary. *See Schrock*, 2014 WL 5243444, at *2 ("It is true under *Hartsfield* that the State need not destroy the evidence itself, but it must nevertheless have had some knowledge that its inaction would result in the destruction of the evidence. Schrock has made no such showing here."). "Mere negligence is not enough, for it does not sustain the inference of consciousness of a weak case."

*See State v. Stephen*, No. 10-0286, 2011 WL 5393453, at *13 (Iowa Ct. App. Nov. 9, 2011) (quoting *Langlet*, 283 N.W.2d at 333)).

In any event, there is no showing of prejudice with respect to the sexual abuse charge. Unlike *Hartsfield*, the contents of the video were described by an impartial witness. The impartial witness testified the video showed Sinn and C.W. conversing at the bar and captured C.W.'s drunken stumbling. It was not disputed at trial that Sinn and C.W. were at the bar together. It was not disputed C.W. was drunk. It was not disputed C.W. and Sinn left the bar together. It was also not disputed C.W. later found herself nearly naked face down in a ditch during the middle of a rain storm and that Sinn left her there. Her phone, sandals, muddy shorts, and underwear were found in Sinn's car. The video had limited, if any, relevance to the sexual-abuse charge. At trial, defense counsel conceded the video surveillance footage was more relevant to the theft charge. Defense counsel conceded the relevance of the footage was limited after the district court dismissed the theft charge.

The district court did not commit reversible error in declining the requested spoliation instruction.

### III.

In his next claim of error, Sinn challenges the sufficiency of the evidence supporting his conviction for sexual abuse. He contends there was insufficient evidence of a sex act. We will uphold a verdict if substantial record evidence supports it. *See State v. Webb*, 648 N.W.2d 72, 75 (Iowa 2002). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *Id.* at 75–76. When reviewing for the sufficiency of

the evidence, we view the evidence in the light most favorable to the State but consider all evidence in the record. *Id.* at 76. "The State must prove every fact necessary to constitute the crime with which the defendant is charged. The evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *Id.* (internal citations omitted). "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006).

We evaluate the sufficiency of the evidence in light of the instructions given where, as here, the instructions were given without objection. *See State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009) ("[Defendant] did not object to the instructions given to the jury at trial. Therefore, the jury instructions become the law of the case for purposes of our review of the record for sufficiency of the evidence."). The marshaling instruction provided:

> 1. On or about August 4, 2016, through August 5, 2016, the defendant performed a sex act with C.W.
> 2. The defendant performed the sex act by force or against the will of C.W. or while C.W. was suffering from a mental incapacity or physical incapacity which prevented C.W. from giving consent. The terms "mental" and "physical incapacity" are defined elsewhere.
> 3. The defendant knew or reasonably should have known that C.W. was mentally incapacitated or physically incapacitated.

The jury instruction defined "sex act" to mean any sexual contact:

> 1. By penetration of the penis into the vagina or anus.
> 2. Between the mouth of one person and the genitals of another.
> 3. Between the genitals of one person and the genitals or anus of another.
> 4. Between the finger or hand of one person and the genitals or anus of another person.
> 5. By a person's use of an artificial sex organ or a substitute for a sexual organ in contact with the genitals or anus of another.

When the evidence is viewed in the light most favorable to the verdict, there is substantial evidence to support a reasonable inference Sinn committed a sex act by penetration of the penis into the vagina. C.W. awoke in a ditch missing her underwear, shorts, and shoes. She complained of pain in her vagina both upon awaking and at the hospital. She testified Sinn had previously exposed his penis to her, and she observed his penis was pierced. She testified she "felt gross down there." She had scratch marks on her legs consistent with fingernails. The emergency-room physician concluded C.W. had injuries consistent with an assault and possible penetration of the vagina. S.S. testified Sinn was in possession of his blue happy pill prior to leaving with C.W. Police were unable to locate any pills, from which the jury could infer Sinn used it. Conrad testified Sinn told him he drove the woman to a gravel road where no one was around and "took advantage of [C.W.], tore her panties off and scratched her p*ssy." Scratch is a slang term meaning to "engage in a sexual act with, most commonly intercourse." *Scratch*, Urban Dictionary, https://www.urbandictionary.com/define.php?term =scratch.

There is also substantial evidence of a sex act between the mouth of one person and genitals of another. Conrad testified Sinn told him "he made her suck his d*ck." Officer Fowler testified Sinn told him that he drove around with C.W. while she performed oral sex. Deputy Bell testified Sinn made similar statements to him.

Sinn's admissions were corroborated by other evidence. *See State v. Meyers*, 799 N.W.2d 132, 139 (Iowa 2011) (discussing the requirement of corroborating evidence to show a sex act occurred). Stith testified Sinn and C.W.

were together at the bar. Conrad testified Sinn told him he drove the woman to a gravel road where no one was around and punched the woman and knocked her unconscious. Sinn's vehicle was caked with fresh mud, corroborating Sinn's admission he drove around on rural roads during a rain storm while C.W. performed oral sex on him. Deputy Bell testified he observed white gravel and stains on Sinn's pants. C.W. was in a ditch by a gravel road. She had a bruised and swollen eye consistent with being punched unconscious.

Because we have concluded there is substantial evidence establishing both sex acts, we need not address Sinn's claim new trial is required pursuant to *State v. Tyler*, 873 N.W.2d 741 (Iowa 2016) and *State v. Schlitter*, 881 N.W.2d 380 (Iowa 2016) because the jury returned only a general verdict when alternative factual methods of committing a single legal offense were presented to the jury.

IV.

For the above-stated reasons, we affirm Sinn's conviction for sexual abuse in the third degree.

**AFFIRMED.**