# IN THE COURT OF APPEALS OF IOWA

No. 17-1639
Filed March 6, 2019

**STATE OF IOWA,**
　　Plaintiff-Appellee,

**vs.**

**DARIUS ALBERTEZ RAMANTEZ WRIGHT,**
　　Defendant-Appellant.

_____

　　Appeal from the Iowa District Court for Woodbury County, Patrick H. Tott, Judge.


　　The defendant challenges the sufficiency of the evidence to support his convictions for robbery in the first degree and willful injury. **AFFIRMED.**


　　Rees Conrad Douglas, Sioux City, for appellant.

　　Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.


　　Considered by Potterfield, P.J., Doyle, J., and Blane, S.J.*

　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**POTTERFIELD, Presiding Judge.**

Darius Wright appeals his convictions for robbery in the first degree and willful injury. He argues neither conviction is supported by substantial evidence.[1]

**I. Background Facts and Proceedings.**

In February 2017, Wright was charged with one count each of attempted murder, willful injury, intimidation with a dangerous weapon, and robbery in the first degree. All four counts involved allegations stemming from the night of February 10, 2017. Wright waived his right to a trial by jury, and the court heard the evidence at a bench trial in April 2017.

At trial, N.W.[2] testified that on the night of February 10, he and two of his friends—K. R. and G.B.—walked south from his home several blocks to a local gas station. The three entered the gas station at approximately 10:41 p.m. While there, N.W. purchased two Dr. Peppers, a package of Sour Patch Kids, and a bag of Flaming Hot Cheetos.[3]

On the return walk to N.W.'s home, N.W., K.R., and G.B. encountered a man that each identified as Wright at trial. Wright changed directions and began walking with the group, repeatedly asking N.W. what he was carrying in his

---

[1] Wright also filed a supplemental pro se brief. Insofar as he raises an equal protection claim, that issue was not raised before the district court and is not properly preserved for our review. *See Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." (citation omitted)). Additionally, to the extent we otherwise understand Wright's pro se claims to involve the sufficiency of the evidence, we consider them in conjunction with the claims made by Wright's appellate attorney.

[2] A number of the individuals involved in the events on the night of February 10 were minors. We refer to them by their initials only. *See State v. Tyler*, 873 N.W.2d 741, 745 n.2 (Iowa 2016).

[3] We understand this product to be "Flamin' Hot Cheetos," but it is in our record as "Flaming Hot Cheetos."

pockets, to which N.W. told him, "None of your business." At some point, Wright grabbed N.W.'s arm and started throwing punches at him. N.W. dropped the gas station bag with the snacks and tried to defend himself. Wright then pulled what N.W., K.R., G.B. each testified was a gun from behind his back, pointed it at N.W., and told him to "[g]ive me what you got." N.W. threw his cell phone toward Wright, and N.W., K.R., and G.B. fled to N.W.'s home. Neither N.W. nor his friends picked up the gas station bag before they left.

At 10:48, Wright entered the gas station carrying two Dr. Peppers. He asked the clerk for a bag for the sodas, which he was given, and then left the store. As N.W., K.R., and G.B. testified, and as was captured by the surveillance cameras, Wright wore a blue, long-sleeve jacket or sweatshirt.

When N.W., K.R., and G.B. reached N.W.'s home, they reported to N.W.'s older brother, Alan, what had occurred. Alan and N.W. decided to try and get N.W.'s phone from Wright; they armed themselves with a BB gun and two knives. The four, including K.R. and G.B. then began walking from N.W.'s home toward the area they had encountered Wright.

As they neared the area, Wright—who was standing on the porch of a corner home a few blocks from the gas station—yelled, "Hey you," to N.W. N.W. and Alan then approached the porch while K.R. and G.B. stayed on the other side of the street. N.W. and Wright argued about the fact that Wright had taken N.W.'s phone and whether he was going to return it. According to both N.W. and Alan, during the argument, Wright kept his hand behind his back. Alan testified he could see that Wright was holding on to the handle of a gun but that he never pulled it out or pointed it at anyone during that time. Eventually, an older man who was

also on the porch told Wright to give N.W. his phone back, and Wright did so. The older man then walked away from the area. N.W. continued to argue with Wright about what had happened to his snacks and wanting them back. Wright went to the door of the home and yelled something. Four or five guys exited the house, and N.W. and Alan began running towards the gas station. At least three of the guys chased them to the store. Another one or two started chasing K.R. and G.B. the other direction.

At 11:17, N.W. and Alan entered the gas station and asked the clerk to call 911. Wright and two friends, Donte Drappeaux and Tykell Robinson, entered the store about the same time. The store clerk tried to keep the two groups separate while Wright and his friends continued to attempt to reach N.W. and Alan. At some point, Wright, Donte, and Tykell exited the store. At 11:22, Tykell and Donte returned without Wright. According to the testimony of the gas station clerk, Wright had left the area by the time Tykell and Donte came back into the store. The first police officer arrived at the scene about one minute later.

Around the same time, Skyla Wabasha, Eric Silvas, and A.C.-M. were walking to the gas station. On the way they encountered a girl and a boy—presumably K.R. and G.B.[4]—who reported their mutual friend had been robbed of his phone. After imparting the information, the boy and girl walked away, and Skyla, Eric, and A.C.-M continued toward the gas station.

---

[4] The district court concluded the girl and boy were K.R. and G.B.; neither of them testified about meeting or sharing information with anyone on their walk back to N.W.'s home, and none of the other witnesses named them in their testimony.

The three walked down the alley that passed directly behind the corner home where Wright had been standing when he argued with N.W. and Alan. As they approached the corner home, they saw a man running toward them in the alley, who then turned toward the corner home and disappeared from their view. When they got near the corner home, Eric and A.C.-M. saw a man on the porch of the corner home and approached it. The man was wearing a blue jacket and matched the description of Wright. At trial, neither A.C.-M, Eric, nor Skyla specifically identified Wright as the man on the porch. A.C.-M. shouted at the man, asking if he had taken his friend's phone. According to Eric's testimony, the man on the porch got defensive and "a little mad at [A.C.-M.] trying to be a hero"; during the interaction, the man "had, like, something on his back or whatnot. He had his hand behind his back the whole time." Almost immediately after A.C.-M shouted at the man, the man on the porch fired four shots in rapid succession. Two of the shots hit A.C.-M.—one in his hip and the other in the chest or shoulder area. Eric testified he did not see the man on the porch pull out a gun, but he saw the man on the porch pointing it A.C.-M. and saw "sparks or whatever a gun does" when he heard the first gunshot.

A.C.-M., Skyla, and Eric fled to the gas station, where police had already gathered based on the clerk's 911 call.

Based on a call reporting shots fired in the area—at approximately 11:30 p.m.—police officers were dispatched to the area near the corner home. Once they were in the area, a neighbor came outside and told the officers he heard arguing and gunshots "directly to the south part of the residence" of the corner home—where the porch is located. The officers searched the area and located

two shell casings from a .22. One officer saw movement in an upstairs window; they tried to get any occupants of the home to come out. A number of hours later, during which the officers kept a perimeter around the home and the SWAT team arrived, Wright and Willie Williams exited the house. At the time he left the house, Wright was wearing a gray jacket. No one else was in the home.

During their subsequent search of the house pursuant to a search warrant, officers located two Dr. Peppers. One of the Dr. Peppers was open in a bedroom. In the closet of that bedroom, officers found hidden under a number of pillows the blue jacket Wright was wearing in the gas station. Officers also found a bag of Flaming Hot Cheetos—the only food in the kitchen cupboard—and a package of Sour Patch Kids in a bag from the local gas station.

Police interviewed Wright after he exited the home in the early morning hours of February 11. During the interview, Wright lied to the officers, telling them he had not been at the local gas station since the previous morning.

At trial, Wright testified in his own defense. While testifying, he was asked by the State why he switched from wearing his blue jacket to his gray jacket. He said there was "no specific" reason why he changed his clothes and maintained he did not place the blue jacket under the pillows in the closet.

No other blue jackets or sweatshirts were located in the home during the execution of the search warrant.

Following the bench trial, the court pronounced judgment. The court acquitted Wright of attempted murder, finding the State had not established Wright had the specific intent to cause the death of A.C.-M. when he fired the gun at him. But the court found Wright guilty of the lesser-included offense of assault with

intent to commit serious injury. The court also acquitted Wright of intimidation with a dangerous weapon. Wright was found guilty of willful injury and robbery in the first degree. The court determined the conviction for the lesser-included offense of assault with intent to commit serious injury merged with the conviction for willful injury.

Wright was sentenced to a term of incarceration not to exceed ten years for the willful-injury conviction and twenty-five years for the robbery conviction. The court ordered Wright to serve the two sentences consecutively.

Wright appeals.

**II. Standard of Review.**

We review claims of insufficient evidence for correction of errors at law. *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013).

**III. Discussion.**

Wright challenges the sufficiency of the evidence to support his convictions. When a sufficiency-of-the-evidence claim is made on appeal from a criminal bench trial, error preservation is no barrier. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). This is because "the court is the fact finder and its findings of guilt necessarily includes a finding that the evidence was sufficient to sustain a conviction." *State v. Abbas*, 561 N.W.2d 72, 74 (Iowa 1997).

In reviewing the district court's finding of guilt, "we view the evidence in the light most favorable to the State." *Id.* "In determining if there was substantial evidence, we consider all of the evidence in the record, not just the evidence supporting a finding of guilt." *Id.* This includes making "legitimate inferences and presumptions that may reasonably be deduced from the evidence in the record."

*State v. Armstrong*, 787 N.W.2d 472, 475 (Iowa Ct. App. 2010). It is the State's burden to prove every element of each of the crimes with which Wright is charged. *See id.* And "[t]he evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *Id.* (citation omitted).

### A. Robbery in the First Degree.

The district court defined the elements of robbery in the first degree as:

> 1. On or about the 10th day of February, 2017, [Wright] had the specific intent to commit a theft.
> 2. In carrying out his intention or to assist him in escaping from the scene, with or without the stolen property, [Wright]: a) committed an assault on [N.W.] and/or b) aided and abetted Tykell Robinson who committed an assault on [G.B.].
> 3. The defendant was armed with a dangerous weapon.[5]

Wright challenges only the third element. He maintains there is no evidence in the record to support the finding that the "gun" that N.W., K.R., and G.B. testified he pulled on N.W. was an actual working firearm, arguing it could have been a toy meant to look like a working gun.

In *State v. Dean*, No. 12-1876, 2013 WL 6118656, at *1 (Iowa Ct. App. Nov. 20, 2013), a panel of our court was asked to decide whether substantial evidence supported the defendant's convictions for intimidation with a dangerous weapon and for being a felon in possession of a firearm when "there was no physical evidence he had a 'real gun,' as opposed to a 'fake gun.'" Our court found the evidence substantial because there was "circumstantial and contextual evidence"

---

[5] The court relied upon Iowa Criminal Jury Instruction 200.21 for the definition of dangerous weapon, which it defined as follows:
> A "dangerous weapon" is any device or instrument designed primarily for use in inflicting death or injury, and when used in its designed manner is capable of inflicting death. It is also any sort of instrument or device actually used in such a way as to indicate the user intended to inflict death or serious injury, and when so used is capable of inflicting death.

the defendant possessed a functional gun. *Dean*, 2013 WL 6118656, at *3. We included as part of that evidence the facts that the defendant engaged in a fight with people and then made a point to retrieve the weapon. *Id.* Additionally, like here, the witnesses in *Dean* testified they saw the defendant pull out a gun and aim it at a person. *See id.*

Because Wright, while robbing N.W., brandished the weapon as if it were real, it appeared to the witnesses who testified about it that it was real, and there is no evidence in the record to suggest otherwise, substantial evidence supports Wright's conviction of robbery in the first degree. *See State v. Allen*, 343 N.W.2d 893, 897 (N.C. 1986) ("In an armed robbery case, the jury may conclude that the weapon is what it appears to the victim in the absence of any evidence to the contrary."); *see also People v. Davis*, 26 N.E.3d 932, 935 (Ill. App. Ct. 2015) ("Both the supreme court and this court have consistently held that eyewitness testimony that the offender was armed with a gun, combined with circumstances under which the witness was able to see the weapon, is sufficient to allow a reasonable inference that the weapon was a real gun.").

**B. Willful Injury.**

The district court defined the elements of willful injury as:

> 1. On or about the 10th day of February, 2017, [Wright] shot [A.C.-M.] in the chest and hip/buttocks.
> 2. [Wright] specifically intended to cause a serious injury to [A.C.-M.]
> 3. The defendant caused a serious injury to [A.C.-M.][6]

---

[6] Before trial, Wright stipulated that A.C.-M. suffered a serious injury as a result of being shot on February 10.

Wright challenges the court's determination that the State proved beyond a reasonable doubt that he was the individual who shot A.C.-M. He relies upon the fact that neither Eric, Skyla, nor A.C.-M. identified Wright as the shooter in open court. Additionally, he notes that while surveillance video and police testimony make it clear Tykell and Donte were not in the area of the corner home at the time of the shooting, the "older man" who had been on the porch during the confrontation between N.W. and Wright and one or two of the "four or five guys" who came out of the house at Wright's call were not accounted for.

We agree with the district court that substantial evidence supports the determination Wright was the shooter of A.C.-M. N.W., K.R., and G.B. testified Wright was wearing a blue jacket and carrying a gun at his back, presumably in his waistband, before he pulled out the gun and robbed N.W. Wright conceded in his testimony that the blue jacket recovered by police was his and that he had worn it into the gas station on the night in question. Before the police arrived, at 11:23 p.m., Wright had left the store. Around that time, A.C.-M., Skyla, and Eric were told that a kid had been robbed for his cell phone in the neighborhood. As they walked toward the corner house, a man in a blue jacket who matches Wright's description came running up the alley from the direction of the gas station. The guy turned toward the corner home, and then A.C.-M. and Eric approached him when he was on the porch of the home. After A.C.-M. asked him if he had taken his friend's phone, the man became defensive, retrieved a firearm from behind his back, and fired four shots.

Police arrived at the home shortly thereafter, and only Wright and Willie were inside. The men refused to come out for a number of hours. When Wright

finally did, he had changed into a gray jacket. Officers located the blue jacket—the only one in the home—hidden in a closet under a pile of pillows.

Although A.C.-M., Skyla, and Eric were unable to positively identify Wright in court, the identifying information they were able to provide, in addition to the circumstantial evidence, supports a finding Wright was the shooter. *See State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981) ("[C]ircumstantial evidence is just as probative as direct."). The man, matching the description of Wright and what Wright was known to be wearing only a few minutes earlier, came running from the direction of the gas station. According to Eric's testimony, the kids who reported the robbery of their friend were still with them in the alley at that time and they pointed at the running man and said, "That's him right there."[7] The man ran to the corner home and was standing on the porch when A.C.-M. approached him and asked if he had stolen the phone of A.C.-M.'s friend. The man became defensive and retrieved a firearm from behind his back—the same place Wright had his gun before the altercation with N.W. While there may have been other people nearby at the time of the shooting, Eric testified there was only one person on the porch at the time of the shooting, and that was the man who matches Wright's description and was wearing the blue jacket.

---

[7] Eric testified he was unable to say whether the man he saw running in the alley who the kids pointed out to him was the same man he saw stand on the porch and ultimately shoot A.C.-M. But Skyla testified the man who was running who matched Wright's description ran to the corner home and A.C.-M.'s testimony implied it was the same man in the alleyway as on the porch.

**IV. Conclusion.**

Because substantial evidence supports both of Wright's convictions, we affirm.

**AFFIRMED**