# IN THE COURT OF APPEALS OF IOWA

No. 19-1103
Filed September 23, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CHRISTIAN DANIEL SOUSLEY,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Linn County, Fae Hoover Grinde, Judge.

Christian Sousley appeals his convictions of second-degree sexual abuse and sexual exploitation of a minor. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Robert P. Ranschau, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., Schumacher, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**SCOTT, Senior Judge.**

Christian Sousley appeals his convictions of second-degree sexual abuse and sexual exploitation of a minor. He argues the district court abused its discretion in overruling an objection to expert testimony claimed to be beyond the scope of the minutes of evidence, the evidence was insufficient to support his convictions and the court erred in overruling his motions for judgment of acquittal, his counsel rendered ineffective assistance in failing to object to improper vouching testimony, and the court abused its discretion in denying his motion for a new trial on his claim the verdict was contrary to the weight of the evidence.

**I.      Background Facts and Proceedings**

The morning of April 30, 2017, J.P. and J.D. were hanging out. At the time, J.P. and J.D., both males, were friends with two females, A.N. and H.W. J.P. and J.D. went to the local town square near the library, a common hang-out spot, to get drunk. They were met there by Sousley and others. J.P. and J.D. each consumed one Four Loko alcoholic beverage. Once the others left, J.P., J.D., and Sousley went to the library, where J.P. contacted A.N. to come pick them up. A.N., who was accompanied by H.W., obliged.

From there, the group drove around for several hours and made various stops. They went to Sousley's residence so he could change his clothes, after which the group traveled to Cedar Rapids to smoke marijuana. Thereafter, J.P. stole a bottle of vodka, which was consumed by the three males. When they ran out, they stole a bottle of whiskey, which was also consumed by the three males. A third bottle of liquor was stolen when the second was dispensed of. J.P. testified H.W. only smoked marijuana and she seemed to be high. Then the group picked

up another female and went to smoke more marijuana. The group grabbed some pizza at a pizzeria across from Sousley's home, dropped the third female off, and then went to J.D.'s house, arriving around 7:00 p.m.

At J.D.'s home, the males and H.W. consumed more alcohol. A.N. left shortly after arrival. A.N. did not consume alcohol or marijuana on the night in question. She testified that, when she left, "nobody was intoxicated, but people were tipsy." The males and H.W. continued to drink and hang out in J.D.'s bedroom. According to J.P.'s testimony, H.W. began showing signs of impairment, slurring her speech and stumbling when she walked. J.D. confirmed in his testimony that H.W. showed signs of impairment. At some point, J.P. went to the bathroom to vomit; when he returned, he observed Sousley and J.D. kissing H.W. J.P. then engaged in a sex act with H.W. J.P. described H.W. was on her stomach and he was behind her with his hands on her hips. At the time, according to J.P., Sousley and J.D. were in the same room. When J.P. observed Sousley was recording the sex act, he discontinued and left the room. J.P. testified that, after he left the room, Sousley engaged in a sex act with H.W., but he did not observe it.

J.P. returned to the room a short time later, where everyone had re-clothed. J.P. observed H.W. "was too drunk to even really talk." J.P., Sousley, and H.W. went to the front porch, where H.W. vomited. The three of them then began walking to J.P.'s house, with the two males essentially carrying H.W. They were stopped by police officers en route. Officer Nicole Hotz testified she stopped the group around 9:18 p.m. when she observed the two males carrying H.W. H.W. exhibited multiple signs of being heavily intoxicated. Hotz testified she did not

observe any signs of the males being impaired. H.W. was breathalyzed, after which she was taken to the hospital by ambulance. J.P. and Sousley then walked to the hospital, but they were removed when Sousley became upset because they were not allowed to see H.W. The pair then stayed the night at Sousley's home.

At the time of the foregoing events, H.W. was fifteen years old. She testified that, on the date in question, she and A.N. were "hanging out and driving around," then they met up with the males and drove around and drank alcohol. She drank "[q]uite a bit," "[m]aybe half a bottle" while they were driving and at J.D.'s house. She began feeling the effects while they were still driving around and, when she was at J.D.'s home, she felt "wobbly," "kind of like going in and out." She testified she remembered taking a photograph with the three males and the next thing she recalled was waking up in J.D.'s room. At that point, someone was on top of her, and she pushed him off. She testified she believed that someone to be Sousley, based on "[t]he size of him compared to the other two people who were there." The evidence showed Sousley was of a larger stature than J.D. and J.P., who were of a smaller stature. After waking up, she went outside and vomited. She recalled being stopped by the police on the way home, taking a breathalyzer, and being taken to the hospital.

The nurse who examined H.W. at the hospital testified H.W. was intoxicated but coherent and exhibiting a normal mood. H.W. denied pain but exhibited abrasions on both of her knees. She had a hickey on her neck, which she did not know how she obtained. She did not know whose clothes she was wearing. A blood test showed a blood-alcohol concentration of .128. H.W. denied experiencing sexual abuse.

Videos were taken during the night in question and were posted on Sousley's Snapchat story.[1] The videos contained four clips of the happenings.[2] The first clip showed the four attendees of the gathering and Sousley exclaiming: "We fucked up this bitch, yo!" The second clip showed Sousley holding up a bottle of liquor next to his face, then stating: "So me and my n***** are fittin' to three-way this bitch tonight." The third clip was a close-up view of a male inserting his penis into a female's vagina; the female was on her stomach and appeared unresponsive, and the male was behind her with his hands on her hips, thrusting. The final clip showed a close up of a penis being inserted into a vagina and thrusting, with the female lying on her back. When shown the Snapchat video during his trial testimony, J.P. confirmed he was the individual penetrating H.W. in the third clip, but he was not the individual in the fourth clip engaged in missionary position intercourse. J.D. testified he witnessed Sousley engage in sexual intercourse with H.W. and he recorded it upon Sousley's request.[3]

The same evening, D.C.-B. viewed the videos on Sousley's Snapchat story. D.C.-B. "was very upset, disgusted, disturbed." D.C.-B. ultimately showed the video to the school resource officer at her high school, who viewed the videos and, upon investigation, learned Sousley was in Cedar Rapids the day in question. She

---

[1] The videos were admitted as evidence at trial and were played for the jury.
[2] There may have been more clips, but the videos essentially show four separate occurrences.
[3] J.D.'s testimony concerning which sex act he recorded was somewhat dicey. He believed he recalled recording the sex act during which H.W. was on her stomach. However, he confirmed he was heavily intoxicated and he was not one-hundred percent sure which act he recorded. He confirmed he was certain he witnessed Sousley engage in a sex act with H.W.

referred the matter to Cedar Rapids law enforcement who, in turn, referred it to Marion law enforcement.

The next day, according to J.P.'s testimony, he and Sousley discussed the events of the prior evening and how having intercourse with H.W. was wrong. Sometime later, Sousley messaged J.P. about law enforcement wanting to speak with him. The two met in person and "tried to get [their] stories straight."

Also the day after the incident, Sousley and A.N. shared the following exchange via text message:

> A.N.: This is [A.N.]. I'm texting you so you have my number when I call
> Sousley: Ok thanks ☹
> A.N.: Why the sad face
> Sousley: Because some shit went down last night and it wasn't cool
> A.N.: I know I'm sorry. I should have been there
> Sousley: No like it wasn't even that you weren't there it's just a fact that me and [J.P.] made a poor decision with [H.W.] and then try to get her home and getting her home did not work out we slept in the hospital last night we'll talk more later
> A.N.: Okay I feel so bad but sounds good
> Sousley: Yeah we do too it's not your fault though it's my fault
> A.N.: How is it your fault
> Sousley: I'll explain later
> A.N.: Alright

A.N. testified after school that day, she picked up J.P., J.D., and Sousley, and the group drove around and talked. The discussion involved the sexual contact with H.W., "but it was said like as in everybody had done it." A.N. testified Sousley specifically told her he had sexual intercourse with H.W.

Sometime after the incident in question, Sousley and H.W. had the following messaging exchange:

> Sousley: We were all f****d up. I promise you that's literally how it went.

H.W.: I DIDN'T WANT YOU TO F*** ME LEAVE ME ALONE.

Sousley: I never said you did we were all drunk and when we and when we're drunk shit happens.  What the fuck did I do?

H.W.: My dad wants to call the cops on you.

Sousley: Why

H.W.: Why did u screenshot

Sousley: Because I have to turn myself in. . .

H.W.: no

Sousley: I don't know why your dad's calling the cops.

H.W.: he wants to bc you had sex with me and I was drunk bc he heard me talking on the phone

Sousley: Okay don't admit to it though.

H.W.: don't kill yourself . . . .

H.W.: are you ok

Sousley: No I'm not

Sousley: Yeah we had sex...........☹

H.W.: yeah Ik[ ] and I'm mad ab it.  but I don't hate you

Sousley: Why are you mad about it?

H.W.: bc i dont remember it and I didn't want to have sex with anybody

Sousley: Well you came on to me and I was drunk too so I thought it was okay.....☹☹

H.W.: i dont remember that.  I remember you kissing me that's it.

Investigation of the matter was assigned to Sergeant Jeffrey Hartwig. Hartwig subpoenaed Snapchat for information relating to the account shown in the video.  He received, among other things, the phone number associated with the account.  When Hartwig called the number, Sousley answered.  Hartwig scheduled a time to meet with him.  Hartwig subsequently met with Sousley near his home and interviewed him in his vehicle.[4]  Sousley explained he was new in town, just having moved to Marion from Des Moines, and met J.D. and J.P. on the date in question.  He gave them his phone number to drink together later, but they never called.  Then, later in the evening, J.P. called him asking for help, stating, "This girl

---

[4] An audio recording of the interview was admitted as evidence and played for the jury.

is super drunk and it's pouring down rain." Sousley proceeded to J.P.'s house and tried helping H.W. home, then they were stopped by the police, and H.W. was taken to the hospital. He was contacted by H.W. a week later, and Sousley claimed to her that he had "no role" in what happened. He noted "rumor has it" a video was made. In mid-June, Hartwig had another encounter with Sousley. During this exchange, Sousley claimed he was not involved and J.P. asked him to lie for him. Hartwig revealed to Sousley that he had seen the Snapchat videos.

Sousley was arrested in July. He was formally charged by trial information in August with second-degree sexual abuse and sexual exploitation of a minor.[5] Several recordings of Sousley's phone calls from the jail were recorded and admitted as evidence at trial. In one recording, he stated he has to "fight . . . just because [he] f****d a bitch that was a couple years younger than [him]." He also stated, "The bitch was drunk and she wanted to f*** somebody, so she f****d everybody." Sousley answered in the affirmative when asked by the person on the other end of the line, "Did you have sex with her?" Sousley also explained, "I f****d [H.W.], not [A.N.] [H.W.] is the bitch I f****d, and they know that. . . . The only thing I had was [H.W.] that's it." In another recording, he stated, "They know me and [H.W.] had sex because they have text messages of it. . . . I text her the next day and told her, hey just letting you know, shit, we f****d last night and shit." He made several more similar statements along the same lines. In a third recording, he stated, "The girl got drunk and we took advantage of the situation." In a fourth

---

[5] J.P. was charged with the same crimes as a codefendant. He pled guilty to one count of third-degree sexual abuse. J.D. pled guilty for his involvement in juvenile court proceedings.

recording, Sousley stated, "All I did was take a video, man, and that's really it" and "I recorded a video I probably shouldn't have." In the fifth recording, he acknowledged the existence of a video on his Snapchat account, he thought nobody knew about it except him and J.D., and he felt bad about it.

Sousley testified on his own behalf at trial. He testified on the date in question he met up with J.P. and J.D., and later with A.N. and H.W. Then, they "drove around and got high and decided [they] were going to drink." They eventually went to J.D.'s house, and A.N. left shortly thereafter. Sousley testified he had no data on his cell phone so he used J.D.'s phone to access his Snapchat account. However, J.D. testified he had no data on his phone either and he also did not have wireless internet access. And the evidence suggests videos could not be posted without either data or wireless internet. According to Sousley, using J.D.'s phone, he recorded and posted the first two clips that appeared on his Snapchat story. He claimed his comment about "fittin' to three-way this bitch tonight," was a reference to him, J.P., and J.D. all sharing the bottle of liquor depicted in the video. According to Sousley, there was never any discussion amongst the males about engaging in sex acts with H.W. He claimed he returned J.D.'s phone to him without signing out of his Snapchat account and, thereafter, he was in the kitchen eating tater tot casserole when J.P. was having sex with H.W. He denied recording the remainder of the video clips and claimed J.D. took the videos and posted them. Sousley acknowledged having sex with H.W. and asserted it was consensual and H.W. actively participated and was never passed out or unconscious. He allegedly learned of the posting of the videos the next day

when he got home, logged into Snapchat on his phone, and reviewed messages he received from a variety of individuals.

Additional phone recordings from the jail were admitted as evidence to impeach Sousley's testimony. In the first, Sousley stated, "We was all in the room when it was recorded. I was in the room when it happened." In a second recording, he stated, "No face, no case." Another recording provided the following exchange between Sousley and his mother:

> Sousley: What happened was we were at party or whatever, and I happened to be in the same room as [J.P.] and the girl while they were
> Mother: Wasn't there a bunch of people there doing the same thing?
> Sousley: Yeah, it wasn't just them, but there was a bunch of people and I happened to walk in on it and then, like, I snuck back out the room and, like, got out my camera and caught a Snapchat. Honestly that's what it come down to.

On redirect following the playing of these recordings before the jury, Sousley claimed he was referring to trying to catch a Snapchat of "smoking dabs," and the State was taking his calls out of context. Sousley then played a phone call recording of his own, in which he stated, "We was all over Snapchat talking about how we gonna' three-way this bottle and shit. . . . I'm talking about the bottle, not literally a bitch."

Following the State's case-in-chief, Sousley moved for judgment of acquittal. As to count one, he argued the State failed to produce sufficient evidence H.W. was unconscious and that he was aided and abetted. As to count two, he claimed the evidence was insufficient to show he was involved and knew, had reason to know, or intended that the act would be photographed, filmed, or otherwise preserved or that he caused or attempted to cause H.W. to engaged in

a prohibited sexual act. The motion was denied. Following the evidence for the defense, Sousley renewed his motion, which the court denied on the basis that there was sufficient evidence to engender questions for the jury.

Ultimately, the jury found Sousley guilty as charged. Sousley moved for a new trial arguing, among other things, the verdicts were contrary to the weight of the evidence. He also filed a motion in arrest of judgment on sufficiency-of-the-evidence grounds. The court heard the motions at the time of sentencing and denied them. Sousley appealed following the imposition of sentence.

## II.     Analysis

### A.     Vouching

We begin with Sousley's claim his attorney was ineffective in failing to object to allegedly improper testimony vouching for the credibility of H.W.[6]  Specifically, he claims his counsel was under a duty to object to the forensic interviewer's testimony concerning delayed disclosure, reluctance in disclosure, shame and embarrassment, and continuing relationships with the perpetrator following the abuse.

Appellate review of claims of ineffective assistance of counsel is de novo. *State v. Gordon*, 943 N.W.2d 1, __, 2020 WL 2090108, at *3 (Iowa 2020).  To succeed on his ineffective-assistance-of-counsel claims, Sousley must establish "(1) that counsel failed to perform an essential duty and (2) that prejudice resulted."

---

[6] Effective July 1, 2019, section 814.7 was amended to prohibit claims of ineffective assistance of counsel to be raised or decided on direct appeal.  2019 Iowa Acts ch. 140, § 31.  Because judgment and sentence were entered prior to the statutory amendment's effective date, it does not apply to Sousley's direct appeal.  *See State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019).

*State v. Kuhse*, 937 N.W.2d 622, 628 (Iowa 2020); *accord Strickland v. Washington*, 466 U.S. 668, 687 (1984). We "may consider either the prejudice prong or breach of duty first, and failure to find either one will preclude relief." *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017) (quoting *State v. Lopez*, 872 N.W.2d 159, 169 (Iowa 2015)).

Sousley argues the witness's testimony about "general dynamics of sexual abuse" "seem to be carefully tailored to bolster H.W.'s testimony." But the witness only testified generally as to why young victims are reluctant to disclose and reasons why a victim might maintain a relationship with their abuser. She also explained, "every person is different" and "[i]t depends on the person." The witness did not refer to H.W. specifically, nor did she link any of the common tendencies she testified about to H.W. Thus, we find an objection on vouching grounds would have been meritless. *See State v. Leedom*, 938 N.W.2d 177, 192–93 (Iowa 2020) (noting, "Experts may express general opinions but may not directly comment on the child's credibility" and finding testimony that "was general in nature describing why children delay disclosure, the grooming process, why children have an inability to recall specific dates" permissible); *State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014) (noting general testimony about tendencies of victims of sexual abuse is allowed when "the expert witness avoided commenting directly on the child at issue"). As such, counsel was under no duty to object and was not ineffective as alleged.

B.      Scope of the Minutes of Evidence

Sousley argues the district court abused its discretion in overruling his objection to the testimony of the forensic interviewer on the basis that it was

allegedly beyond the scope of the minutes of evidence. He specifically complains of the interviewer's "testimony regarding the dynamics of sexual abuse experienced by young people," including delayed and reluctant disclosure, shame, and maintaining a relationship with an abuser. Our review is for discretionary abuse, which requires a showing the court's decision was based on grounds clearly untenable or to an extent clearly unreasonable. *State v. Hayes*, 532 N.W.2d 472, 476 (Iowa Ct. App. 1995). This is our most deferential standard of review. *State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017).

The minutes of evidence provided that the social worker who conducted the forensic interview of H.W. would testify regarding the examination and interview as well as "further facts and details regarding the case." In a pretrial motion in limine, filed months before trial, the defense requested her testimony be limited to the substance of her report and not include any information not specifically disclosed in her report. At the beginning of trial, the court essentially ruled the defense could object as it deemed necessary. Prior to the social worker's testimony, the defense requested that the social worker not be allowed to testify to her expert opinions because they "were not disclosed in the minutes."

On direct examination, the social worker was asked generally about victims' reluctance of reporting sexual abuse. The defense counsel objected, claiming such testimony was beyond the scope of the minutes of evidence. The objection was overruled. Counsel lodged several more objections to testimony regarding disclosure and continuing relationships with abusers as beyond the minutes of evidence, which were all overruled.

"[T]here is no requirement that the minutes of testimony provide a complete catalogue of witness testimony at trial, but only that the defense be placed on fair notice and not subject to surprise testimony." *State v. Shorter*, 893 N.W.2d 65, 81 (Iowa 2017). And, "a defendant is not entitled to relief due to defective minutes under [Iowa Rule of Criminal Procedure] 2.5(3) when the defense is not surprised by the subsequent testimony." *Id.* at 83. "[W]hen the challenged minutes, though incomplete, put defendant 'on notice of the necessity of further investigation of the witness'[s] probable testimony,' reversal need not follow admission of matters they do not disclose." *State v. Musso*, 398 N.W.2d 866, 868 (Iowa 1987) (citation omitted).

> We generally will not reverse on the ground of technical defects in procedure [including defects relating to minutes of evidence] unless it appears in some way to have prejudiced the complaining party or deprived him or her of full opportunity to make defense to the charge presented in the indictment or information.

*State v. Braun*, 495 N.W.2d 735, 741 (Iowa 1993).

Sousley's claim of error is not one of constitutional dimension. Assuming without deciding the challenged testimony was beyond the scope of the minutes, we turn to the distinction between harmless and reversible error. "Where a nonconstitutional error [is] claimed, the test for determining whether the evidence [is] prejudicial and therefore require[s] reversal [is] this: 'Does it sufficiently appear that the rights of the complaining party have been injuriously affected by the error or that he has suffered a miscarriage of justice?'" *State v. Ness*, 907 N.W.2d 484, 488 (Iowa 2018) (alterations in original) (quoting *State v. Sullivan*, 679 N.W.2d 19, 29 (Iowa 2004)). "We presume prejudice unless the record affirmatively

establishes otherwise." *Id.* (quoting *State v. Moorehead*, 699 N.W.2d 667, 673 (Iowa 2005)).

Upon our review of the record, we find this was not a case about whether the allegation of sexual abuse was credible or not depending upon H.W.'s delayed disclosure or her continuing contact with Sousley. The evidence, even limited to the State's case-in-chief, was nothing less than overwhelming on the question of whether Sousley engaged in a sex act with H.W.—which was exponentially bolstered during the presentation of the evidence for the defense.[7] And the testimony was brief and paled in comparison to the totality of the remainder of the evidence before the jury. Furthermore, as discussed more thoroughly above, the testimony did not impermissibly bolster the credibility of H.W. So, assuming without deciding the testimony was beyond the scope of the minutes, we find no cause for reversal because the record affirmatively establishes Sousley was not prejudiced by the challenged testimony.

C.      Sufficiency of the Evidence

Sousley challenges the sufficiency of the evidence supporting his convictions. Challenges to the sufficiency of the evidence are reviewed for corrections of errors at law. *State v. Mathias*, 936 N.W.2d 222, 226 (Iowa 2019). The court views "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490

---

[7] This is not a statement counsel was ineffective by any means. Sousley provided his account. The State shredded the credibility of Sousley's story with additional impeachment evidence.

(Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. "[W]e will uphold a verdict if substantial evidence supports it." *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018) (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *Ramirez*, 895 N.W.2d at 890). Evidence is not rendered insubstantial merely because it might support a different conclusion; the only question is whether the evidence supports the finding actually made. *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 393 (Iowa 2010). In considering a sufficiency-of-the-evidence challenge, "[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005)).

### 1. Second-degree sexual abuse

The State bears the burden of proving every element of a charged offense. *State v. Armstrong*, 787 N.W.2d 472, 475 (Iowa Ct. App. 2010). Sousley does not challenge the jury instructions employed at trial. As such, the instructions serve as the law of the case for purposes of reviewing the sufficiency of the evidence. *See State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018). On the charge of second-degree sexual abuse, the jury was instructed the State must prove the following elements:

1. On or about the 30th day of April, 2017, the defendant performed a sex act with H.W.
2. The defendant performed the sex act:
    a. Against the will of H.W.; or
    b. While H.W. was unconscious;
3. During the commission of sexual abuse, the defendant was aided or abetted by one or more persons.

Sousley challenges the State's establishment of the second and third elements.

As to the second element, viewing the evidence in the light most favorable to the State, we easily conclude the evidence was sufficient. As to the alternative requiring unconsciousness, there was substantial evidence to support conclusions that H.W. was extremely intoxicated, she passed out, and when she came to Sousley was on top of her performing a sex act, upon which she pushed him off of her. H.W. had no recollection of having sexual intercourse during the night in question. The jury could reasonably conclude that was because she was unconscious. Also, in the video clip of the first sex act with J.P., H.W. appeared unresponsive. The jury could rationally conclude that she was still unresponsive due to being unconscious during the second sex act shortly thereafter. As to the alternative requiring that the sex act was against H.W.'s will, after the incident, she unequivocally advised Sousley, "I DIDN'T WANT YOU TO F*** ME" and "I didn't want to have sex with anybody." We find the evidence sufficient to support the second element.

We turn to the third element, whether Sousley was aided and abetted during the commission of the crime. The jury was provided the following instruction on aiding and abetting:

> "Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or

> when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation. Mere nearness to, or presence at, the scene of the crime without more evidence is not "aiding and abetting." Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting."
>
> . . . .
>
> If you find the State has proved that Defendant Christian Daniel Sousley was knowingly "aided and abetted" by [J.P.] and/or J.D., then the State has proven the "aid and abet" element . . . .

The evidence includes the following. After J.P. vomited, he returned to J.D.'s bedroom and found Sousley and J.D. kissing H.W. J.P. then had sex with H.W., while Sousley and J.D. were in the room, but he discontinued and vacated the room when he observed Sousley recording the act. Then Sousley had sex with H.W., and J.D. recorded the sex act at Sousley's request.

"Circumstances matter." *State v. Tyler*, 873 N.W.2d 741, 751 (Iowa 2016). J.P.'s initial sex act with H.W. "could be regarded as encouragement for what subsequently happened—i.e." further sex acts performed on H.W. by one or both of the other two males in the room. *See id.* at 750–51 (finding evidence was sufficient on aider and abettor theory of liability where a crowd surrounded the victim, the defendant punched him and walked away, and the victim was subjected to further beating by the crowd once he hit the ground). Likewise, J.D. was present throughout the ordeal and obliged Sousley's request that he record Sousley having sex with H.W. J.D.'s agreement could also be regarded as encouragement of the act during its commission.

While there are certainly inconsistencies in the evidence, it is for the jury to sort those out, not us. *See Musser*, 721 N.W.2d at 761. Viewing the evidence in

the light most favorable to the State and verdict, as we must, we find the evidence sufficient to support the challenged elements of second-degree sexual abuse.

### 2. Sexual exploitation of a minor

As to the crime of sexual exploitation of a minor, the jury was instructed the State was required to prove the following elements: (1) Sousley "used, persuaded, induced, enticed, coerced, knowingly permitted or caused a person under the age of 18 years to engage in the sex act of penis penetration into the vagina" and (2) he "knew, had reason to know . . . or intended that the sex act would be filmed." Sousley vaguely challenges the State's establishment of both elements.

We have already concluded the evidence was sufficient to show Sousley engaged in a sex act with H.W. while she was unconscious or against her will. His act of engaging in sex with her is sufficient to show he "knowingly caused" her "to engage in the sex act of penis penetration into the vagina." His direction to J.D. to record the act is also sufficient to show he "knew, had reason to know . . . or intended that the sex act would be filmed."

Viewing the evidence in the light most favorable to the State and verdict, we likewise conclude the evidence was sufficient to support Sousley's conviction of sexual exploitation of a minor.

### D. Weight of the Evidence

Sousley challenges the denial of his motion for new trial on weight-of-the-evidence grounds. We review the district court's denial of a motion for a new trial on weight-of-the-evidence grounds for an abuse of discretion, which, as noted, is our most deferential standard of review. *See State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013); *see also Roby*, 897 N.W.2d at 137. An abuse of discretion

will only be found where "the district court exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003).

The district court may grant a defendant's motion for a new trial when the verdict is contrary to the weight of the evidence. Iowa R. Crim. P. 2.24(2)(b)(6); *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). Where a claim is made that the verdict is contrary to the weight of the evidence, "the verdict may be set aside and a new trial granted" if "the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted." *State v. Serrato*, 787 N.W.2d 462, 472 (Iowa 2010) (quoting *State v. Ellis*, 578 N.W.2d 655, 658–59 (Iowa 1998)). "A verdict is contrary to the weight of the evidence where 'a greater amount of credible evidence supports one side of an issue or cause than the other.'" *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) (quoting *Ellis*, 578 N.W.2d at 658).

This assessment "is broader than the sufficiency-of-the-evidence standard in that it permits the court to consider the credibility of witnesses." *Ary*, 877 N.W.2d at 706. At the same time, however, "it is also more stringent than the sufficiency-of-the-evidence standard in that it allows the court to grant a motion for a new trial only if more evidence supports the alternative verdict as opposed to the verdict rendered." *Id.* The grant of a new trial on weight-of-the-evidence grounds is appropriate "only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *Id.* Notably, our review is limited to "the exercise of discretion by the trial court, not of the underlying question of whether

the verdict is against the weight of the evidence." *Neiderbach*, 837 N.W.2d at 211 (quoting *Reeves*, 670 N.W.2d at 203).

The district court acknowledged it should only grant a new trial on weight-of-the-evidence grounds "in extraordinary situations where the evidence preponderates heavily against the verdict" and that the evidence as a whole supported the verdicts rendered. Upon our review, we are unable to conclude the court denied the motion for a new trial based on untenable grounds or to an extent clearly unreasonable. Finding no abuse of discretion, we affirm the denial of the motion for a new trial.

## III.    Conclusion.

Finding no cause for reversal, we affirm Sousley's convictions.

**AFFIRMED.**